**Opinion issued October 25, 2012**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-10-01022-CV**

_____

**JESUS MIRANDA, Appellant**

**V.**

**STEPHEN BYLES, Appellee**

_____

**On Appeal from the 269th District Court**
**Harris County, Texas**
**Trial Court Case No. 2008-73708**

_____

**DISSENTING OPINION ON REHEARING**

I withdraw my dissenting opinion dated February 16, 2012, and issue this opinion in its stead. I continue to respectfully dissent.

This is a defamation suit arising out of a family dispute over the reporting of the alleged sexual abuse of a three-year-old child to authorities and family members. The trial court awarded damages for defamation per se to the plaintiff, appellee Stephen Byles, the alleged abuser, against appellant, Jesus Miranda, the great-uncle of the child, for two statements Jesus made to family members during the Department of Family and Protective Services' ("DFPS's") investigation of an outcry made against Byles by Jesus's great-niece, L.S., the granddaughter of Byles's common-law wife and Jesus's sister, Lisa Villareal. Following trial on the merits, the trial court found Jesus not to be immune from liability under Texas Family Code section 261.106, which grants immunity from civil liability for statements made in good faith in the course of an investigation of child abuse. The court then found both statements defamatory, and awarded Byles $75,000 in damages. Jesus appeals the judgment but does not appeal the trial court's ruling denying him immunity from liability under section 261.106. The majority affirms the trial court's judgment based on one of the comments.

I would first address Jesus's immunity from liability as jurisdictional error. The jurisdiction of the trial court to enter judgment on Byles's suit for damages for defamation depended upon Jesus's lack of immunity from personal liability. Therefore, the trial court should have determined Jesus's immunity from liability under Family Code section 261.106 before deciding the merits of Byles's

2

defamation suit. It should have held that Jesus was immune from liability on Byles's claims, and it should have dismissed the defamation suit for failure to state a claim for which relief could be granted. Because the trial court determined the merits of Byles's defamation suit *before* determining the issue of Jesus's immunity, Jesus was subjected to a judgment for damages which the trial court lacked jurisdiction to enter.

I would vacate the judgment of the trial court, render judgment that Jesus is immune from personal civil liability for Byles's defamation claims under Family Code section 261.106, and dismiss the suit on the ground that the trial court lacked jurisdiction to try the merits of Byles's claim and to enter a judgment for damages for defamation against Jesus. Alternatively, without regard to Jesus's immunity defense, I would hold that the single statement made by Jesus to his brother Juan that the majority affirms as defamatory was both privileged and opinion and was neither shown to be a statement of fact nor proved to be false. Thus, it does not support the trial court's judgment. Therefore, I would reverse and render judgment that Byles take nothing on the merits of his claim.

### Additional Facts

I adopt the majority's account of the record but would respectfully add the following facts.

On October 5, 2007, L.S. first volunteered to her mother, Valerie Villareal, and her aunt, Vanessa Villareal, that Byles had touched her vagina. At the time, Valerie, Vanessa, L.S., and L.S.'s younger brother, F.S., were all staying with Lisa (Valerie and Vanessa's mother and L.S.'s grandmother) and Byles. Valerie testified in this case, "I was [giving L.S.] a shower and she told me that she— [Byles] had touched her down there, and that was it. She showed me with a hand gesture, and that was it." The outcry was made the day after Byles left on a business trip to Singapore. Lisa refused to believe Valerie's report that anything had happened. Valerie did not initially take L.S. to be medically examined.

Jesus found out about the outcry through family members and urged Valerie to take L.S. to be examined, saying he would do so if she would not. His sister, Lisa, refused to talk to him about the allegations. On October 8, 2007, three days after L.S.'s outcry, Valerie took L.S. to Memorial Hermann Hospital Southwest in Houston to be examined. The hospital required that the Child Protective Services division of DFPS ("CPS") be notified, and CPS and the Austin County Sheriff's Department both opened investigations.

L.S. would not let medical authorities examine her on October 8, but they were able to question her. She named Stephen Byles as a person who had touched her inappropriately. Valerie reported this information to her uncle Jesus.

4

Jesus kept insisting there be a medical examination of L.S., and Lisa kept resisting. Valerie finally took L.S. into Memorial Hermann Hospital, at Jesus's urging, on October 22, 2007, for another interview and a medical examination. Jesus drove her there. A police officer from Austin County was also present. L.S. repeated her outcry to medical personnel at the Children's Assessment Center ("CAC") during the interview, naming Byles. The medical examination was inconclusive.

The January 5, 2008 CPS "Investigation Report" introduced into evidence at the trial of this case states, with respect to the October 22, 2007 examination of L.S., that the case had been referred from Austin County CPS to Harris County CPS. It reports that the Austin County social worker said there were no protective issues with the mother but also that

> [L.S.] said she was touched and pointed to her vagina by AP [alleged perpetrator] who is her grandmother's boyfriend. [L.S.] was not able to distinguish to whether she was penetrated or how she was touched. A medical was attempted at Memorial but was not successful. OV [outcry victim] had a medical exam done today at the CAC clinic. She said Ms. [Valerie] Villarreal does believe that this happened but her mother [Lisa] does not believe.

The report further states that Valerie reported that "[w]hen everything came out her mother put her out of the house because she does not believe anything happened. Law enforcement is going to follow through on charges but she did not know what the charge would be. He has requested the tape and medical records." The case

5

was "administratively closed due to it being work[ed] by a social worker and law enforcement." No tape recordings of the interviews and no medical records of the examinations were introduced into evidence in this case.

The Investigation Report also records several contacts and attempted contacts by CPS with family members in connection with the case. On November 26, 2007, the investigator was unable to reach Lisa Villareal. On November 30, 2007, the report states that Jesus contacted CPS and "advised he is Lisa's brother and is concerned for [L.S. and F.S.] because he heard Lisa was taking them out of the country." Jesus "advised he spoke with Detective Homes [in Austin County] and he is very upset with Austin County not pursuing this case more seriously." The investigator reported that Jesus

> wanted law enforcement to get Lisa to come in by telling her (untruthfully) that her daughter had attempted suicide but Detective Homes was not interested. I advised Mr. Miranda I was not interested either. Mr. Miranda advised he will do anything to assist in the investigation and to please call him if we have questions.

The CPS report for December 3 records a conversation with Lisa's attorney, who stated that "[Lisa] and the children were living in Houston away from [Byles]." The attorney and CPS arranged to transfer the case to Harris County, in which Houston is located, "so we can get this matter resolved." On December 4, 2007, Lisa's attorney told CPS where Lisa and the children were living and said it was "okay for CPS to speak with his client directly."

6

In early December 2007, Lisa filed proceedings in Harris County to obtain custody of the children. Jesus learned about this and, he testified, called CPS at the direction of the Austin County District Attorney to notify it.[1]

The Investigation Report reflected that L.S. was interviewed on December 7, 2007, and that she "stated that no one has touched her inappropriately. . . . She stated that she has not seen [Byles] who is her grandmother['s] boyfriend in a long time." However, Vanessa Villareal reported to the investigator "that [L.S.] did state to her and her sister that [Byles] was touching her private parts. Vanessa stated that she then told her mother who immediately packed their things and they left for a hotel. She stated that [Byles] has not been around since this incident."

Similarly, the Investigation Report reflected that, in her January 3, 2008 interview, Valerie

> stated that [L.S.] told her that [Byles] touched her private parts. She stated that she took [L.S.] to the Southwest hospital for examination and the test did not disclose anything. She stated that the next day she brought [L.S.] to the Children Assessment Center for [an] interview and examination. She stated that the doctor stated there was discharge[] but it was inconclusive if there was sexual abuse. She stated that she does not believe that her mother is allowing contact between [Byles] and children.

The report of the investigator's December 27 interview with Lisa reflects that Lisa "stated that her daughter told her that [L.S.] stated that [Byles] had

---

[1] The trial court found Jesus's testimony not to be credible. However, his statement of the facts stated above is consistent with the testimony of the other witnesses, whom the court found to be credible, and is consistent with CPS records.

fondled her. She stated that after hearing this she gather[ed] their things and they went to a hotel. Lisa stated that [Byles] has not had any contact with the children since this incident."

The Investigation Report concludes: "Disposition and Risk Finding: Ruled Out with factors controlled UTD [unable to determine] for SXAB [sexual abuse] on for [L.S.]."

The CPS "Risk Assessment Report," also completed on January 5, 2008, and also introduced into evidence in this case, references allegations of neglectful supervision of both L.S. and her little brother, F.S., against Valerie and Lisa, which were "Ruled Out"; a report of sexual abuse of F.S. by Byles, which was "Ruled Out"; and a report of sexual abuse of L.S. by Byles, which the report deemed "Unable to Determine." The Risk Assessment Report concluded, "Significant risk factors were identified, but family strengths and available resources are sufficient to provide for the child(ren)'s safety for the foreseeable future." The stated rationale for the finding was that the children were living with Lisa, appeared to be clean and healthy, did not disclose abuse or neglect, and "[t]he children do not have any contact with [Stephen Byles]."

The "Case History of Investigations" noted that the investigation was assigned to an investigator by CPS on November 16, 2007, and completed on January 11, 2008. Like the Risk Assessment Report, the Case History recorded

8

allegations of neglectful supervision of L.S. and her brother, F.S., by both Valerie and Lisa Villarreal, which were "Ruled Out"; allegations of sexual abuse of F.S. by Byles, which was "Ruled Out"; and allegations of sexual abuse of L.S. by Byles, which were marked "Unable to Determine." The overall disposition was "unable to determine," and the risk finding was "factors controlled."

On December 12, 2007, Jesus left a recorded voice-message for Lisa, in which he stated, "Stephen's hand on your granddaughter's vagina isn't what dictates this." This statement is the first of the two statements by Jesus that the trial court found to be defamatory per se in awarding damages to Byles.

The family court held a hearing on temporary custody of L.S. and F.S. in Lisa's custody suit on January 11, 2008. Before the hearing, Jesus called Valerie, told her not to back down, and said, "What if next time he penetrates your daughter?"

Also in January 2008, Jesus made the second statement on which he was found liable for defamation. Neither the exact date nor the specific content of this oral statement by Jesus to his brother Juan was recorded. The trial court found, however, on the basis of Juan's unobjected-to deposition testimony, which was introduced into evidence, that, "In January 2008, Jesus Miranda published a statement to Juan Miranda that a doctor had examined L.S. and that the doctor had confirmed that L.S. had been sexually molested by [Stephen Byles]."

On January 29, 2008, the family court entered an order giving Lisa indefinite temporary custody of L.S. and F.S. The order also enjoined Lisa from "allow[ing] the minor children to be in the presence of [Stephen Byles] until further order of this court." The amicus attorney ultimately represented to the family court that the children would be better off in Lisa and Byles's possession. In May 2008, the family court lifted the portion of its temporary order that prohibited Byles from being in the presence of the two children. Lisa was ultimately awarded custody of L.S. and F.S.

Byles filed the instant defamation suit against Jesus on December 12, 2008, asserting claims of slander per quod, slander per se, and intentional infliction of emotional distress based on Jesus's recorded statement to Lisa, "Stephen's hands on your granddaughter's vagina isn't what dictates this," and on Juan's report that Jesus had told him after the October 22 examination of L.S. that the doctor had confirmed that Byles had sexually assaulted L.S.

In the trial of this case, Juan testified by deposition, without objection, as to the second statement as follows:

Q:    What statement did Mister—or what statements did Jesus make
      about [Stephen Byles] to put him in a negative light?

A:    That he had molested one of my—my niece's kids.

Q:    And who did he—well, strike that. Which child?

A:    [L.S.]

10

. . . .

Q: Okay. And when in time was it that Jesus made this statement to you?

A: This was in January—I believe January of '08.

Q: Okay. And how did the statement come about? Did he call you, or was it in person?

A: It was a telephone call.

Q: Okay. And he called you and said what?

A: That, you know, he knew that [Byles] had done—had molested that—[L.S.]

Q: Did he express it as an opinion that he thought the child had done—that [Byles] had done this, or that he expressed it as a fact?

A: That he knew.

Q: Did he—did Jesus report to you that he had reported to others negative comments about [Byles]?

A: That he had reported to other family members that—right there and then he did not state that he had told anybody else, no.

Q: Okay. And did you later come into any information that that had happened?

A: Yeah.

Q: What information did you receive?

A: From one of my brothers that had come over to my house and they told me that he had already heard a recording and that they knew that, that she has been molested according to—

Q: And where did they get that information from?

A: My brother.

Q. And your brother, you're talking about your brother, Jesus, reported it to what other family members?

11

A:  My brother Gabriel and my brother Andy as far as I knew because they had came and told me.

. . . .

Q:  Okay. Now, did Jesus make any statements to you with regards to whether or not [L.S.] had been taken to a doctor with regards to the sexual abuse claim?

A:  Yes. Yes. Because I—I really hadn't known that she went until he told me.

Q:  And what did he tell you about the doctor appointment?

A:  That she was a—confirmed that she was molested.

Q:  That a doctor had confirmed that she had been sexually molested by [Byles]?

A:  Yes.

Q:  And he told you that in the same conversation?

A:  That was the only conversation I had with him.

In an additional excerpt from his deposition testimony, Juan admitted that Byles had loaned him $5,000, that the arrangement with regard to his paying it back was, "Get back on, you know, financially by self-set in order for me to get the money back to him," and that Byles had also "always offered to help" with his children's schooling. Juan also testified that the family was deeply divided over the issue of whether Byles had sexually assaulted L.S.; that Jesus had stated that he "knew" that Byles had molested L.S. as a matter of fact, not as his belief; that information about the alleged assault relayed to him by Lisa prior to his conversation with Jesus constituted "allegations" that were potentially being

12

investigated; and that what he himself believed—that the molestation had not occurred because "[Byles] would not do that"—was his opinion.

Following trial, the trial court entered the following findings of fact relevant to this dissent:

11. On December 12, 2007, Jesus Miranda published a statement stating "[Stephen's] hands on your granddaughter's vagina isn't what dictates this."

12. In January 2008, Jesus Miranda published a statement to Juan Miranda that a doctor had examined L.S. and that the doctor had confirmed that L.S. had been sexually molested by [Stephen Byles].

13. Jesus Miranda's statements described in ¶¶ 11–12 of the Findings of Fact ("Defamatory Statements") were defamatory concerning plaintiff.

14. The Defamatory Statements were false.

. . . .

28. Neither the Defamatory Statements nor [other statements] were made while assisting in the investigation of a report of alleged child abuse or neglect or while testifying or otherwise participating in a judicial proceeding arising from a report, petition, or investigation of alleged child abuse or neglect.

The trial court also entered the following conclusions of law:

14. Under TEX. FAM. CODE § 261.106(a), a person who in good faith reports or assists in the investigation of alleged child abuse or who testifies or participates in a judicial proceeding arising from a report or investigation of alleged child abuse is immune from civil liability that might otherwise arise.

13

15.     Under TEX. FAM. CODE § 261.106(c), a person who acts in bad faith or with malicious purpose in reporting alleged child abuse or neglect is not immune from civil or criminal liability.

16.     [Miranda] is not immune from liability for [Byles's] claims.

## Jurisdiction

Jesus pled in the trial court that he was immune from civil liability for defamation under section 261.106 of the Child Protection Act, Chapter 261 of the Family Code. The trial court tried Jesus's pleading of immunity simultaneously with the merits of Byles's defamation claim, rejected Jesus's immunity defense, and entered judgment against Jesus on Byles's defamation claim. The trial court found that the "Defamatory Statements" did not fall within the protective scope of section 261.106 and concluded that Jesus lacked immunity from liability. Although he appealed the judgment, Jesus did not appeal the trial court's immunity finding and its conclusion of law that he was not immune from liability. Nevertheless, a jurisdictional question cannot be waived; it may be raised, even for the first time, on appeal; it may be raised by the appellate court sua sponte; and the appellate court has jurisdiction to decide both its own and the trial court's jurisdiction. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445–46 (Tex. 1993).

I would address the immunity issue as fundamental jurisdictional error on the ground that the trial court erred in denying Jesus immunity that protected him

from personal liability and erroneously exercised its jurisdiction to render a judgment for liability against him, despite Byles's failure to state a claim on which relief could be granted.

Family Code section 261.106 provides:

(a) A person acting in good faith who reports or assists in the investigation of a report of alleged child abuse or neglect or who testifies or otherwise participates in a judicial proceeding arising from a report, petition, or investigation of alleged child abuse or neglect is immune from civil or criminal liability that might otherwise be incurred or imposed.

....

(c) A person who reports the person's own abuse or neglect of a child or who acts in bad faith or with malicious purpose in reporting alleged child abuse or neglect is not immune from civil or criminal liability.

TEX. FAM. CODE ANN. § 261.106 (Vernon 2008).

Section 261.106's companion statute, Family Code section 261.101, provides, in relevant part:

(a) A person having cause to believe that a child's physical or mental health or welfare has been adversely affected by abuse or neglect by any person shall immediately make a report as provided by this subchapter.

(b) If a professional has cause to believe that a child has been abused or neglected or may be abused or neglected, or that a child is a victim of an offense under Section 21.11, Penal Code ["Indecency with a Child"], and the professional has cause to believe that the child has been abused as defined by Section 261.001 or 261.401, the professional shall make a report not later than the 48th hour after the hour the professional first suspects that the child has been or may be abused or neglected or is a victim of an offense under Section 21.11, Penal Code. . . .

Id. § 261.101 (Vernon 2008).

15

The trial court found that "the Defamatory Statements" were not "made while assisting in the investigation of a report of alleged child abuse or neglect or while testifying or otherwise participating in a judicial proceeding arising from a report, petition, or investigation of alleged child abuse or neglect." It therefore concluded that Jesus was "not immune from liability for Plaintiff's claims" under subsections 261.106(a) and (c), and it entered a money judgment for $75,000 against Jesus on Byles's defamation claims.

I disagree with the trial court's actions. The trial court should have held a preliminary evidentiary hearing on the jurisdictional facts relating to Jesus's claim of immunity. On the basis of evidence presented, the trial court should have held that Jesus's comments, upon which Byles's defamation suit was based, were privileged statements of opinion made to family members in the course of an investigation of child abuse and that, therefore, Jesus was immune from liability for Byles's suit for defamation under Family Code section 261.106. It should then have concluded that Byles failed to state a claim upon which relief could be granted and that it lacked jurisdiction to enter the money judgment sought. The court should have dismissed the case. Because it did not, I would vacate the judgment as void, and I would enter the judgment the trial court should have entered, dismissing the case for failure to state a claim.

16

"'[J]urisdiction' is the power to hear and determine a controversy, which . . . includes the power to decide whether or not a pleading filed in the court is sufficient to state a cause of action . . . ." *Jud v. City of San Antonio*, 184 S.W.2d 821, 822 (Tex. 1945). "As a general proposition, before a court may address the merits of any case, the court must have jurisdiction over the party or the property subject to the suit, jurisdiction over the subject matter, jurisdiction to enter the particular judgment, and capacity to act as a court." *State Bar of Tex. v. Gomez*, 891 S.W.2d 243, 245 (Tex. 1994). "Subject matter jurisdiction requires that the party bringing the suit have standing, that there be a live controversy between the parties, and that the case be justiciable." *Id.* Thus, "The trial court must determine at its earliest opportunity whether it has the constitutional or statutory authority to decide the case before allowing the litigation to proceed." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). "[F]or a controversy to be justiciable, there must be a real controversy between the parties that will be actually resolved by the judicial relief sought." *Gomez*, 891 S.W.2d at 245. When a court initially has jurisdiction to grant relief to resolve a live controversy between parties with proper standing, but the case subsequently becomes non-justiciable, the court retains certain limited authority to dispose of the case by dismissal. *See Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 865 (Tex. 2010). If the district court lacks jurisdiction in any of these senses, then its

decision does not bind the parties. *Gomez*, 891 S.W.2d at 245. "[A] decision that does not bind the parties is, by definition, an advisory opinion prohibited by Texas law." *Id.*

Immunity from liability is an affirmative defense, as opposed to immunity from suit, which deprives a court of subject matter jurisdiction *ab initio*. *See Miranda*, 133 S.W.3d at 224. Thus, "[i]mmunity from liability and immunity from suit are two distinct principles." *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999) (per curiam) (holding that, like other affirmative defenses to liability, immunity from liability must be pleaded or else it is waived). Immunity from liability does not protect a defendant from all suits, but it "protects the [defendant] from *judgment* even if the Legislature has expressly consented to the suit." *Id.* (emphasis added). Thus, immunity from liability bars a suit for monetary relief against the immune defendant, even though it does not bar a suit for other remedies when the defendant has violated the law. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 368–69 (Tex. 2009) (stating, in governmental immunity case, "Sovereign immunity protects the State from lawsuits for money damages," although sovereign immunity does not bar suits for other remedies where defendant has violated law) (quoting *Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex. 2002)). An action may no longer be continued

against a defendant who cannot be held liable, and no judgment may be rendered against him. *See Brown v. Gay*, 13 S.W. 472, 472–73 (Tex. 1890).[2]

Whether undisputed evidence of jurisdictional facts establishes a trial court's jurisdiction is a question of law. *See Miranda*, 133 S.W.3d at 226. However, "in some cases, disputed evidence of jurisdictional facts that also implicate the merits of the case may require resolution by the finder of fact." *Id.* When the existence of jurisdictional facts is challenged, the court must consider evidence when necessary to resolve the jurisdictional issues raised. *See id.* at 223; *Bland Indep. Sch. Dist. v Blue*, 34 S.W.3d 547, 555 (Tex. 2000). A trial court "has the right to hear the necessary evidence to enable it to decide as to whether or not it has power to try the case it is sought to have it adjudicate, whether the allegations disclosing such want of jurisdiction appear in the petition of the plaintiff, or in the plea to the jurisdiction by the defendant," or, as here, in the affirmative-defense pleadings of the defendant. *See Miranda*, 133 S.W.3d at 226 (quoting *Gentry v. Bowser*, 21 S.W. 569, 570 (Tex. Civ. App.—Fort Worth 1893, no writ)). As the party seeking to invoke the trial court's jurisdiction, the plaintiff must "allege facts that

---

[2] Most immunity law has been developed in the context of governmental immunity, which presents an analogous but not identical situation. Unlike civil immunity, sovereign immunity exists ab initio, must be waived by the state, and, if not shown to be waived, constitutes sufficient reason to dismiss a claim for lack of jurisdiction. Civil immunity must be shown and, if shown, results in failure to state a claim on which relief can be granted, for which the proper remedy is dismissal.

19

affirmatively demonstrate the court's jurisdiction to hear the cause." *See Tex. Ass'n of Bus.*, 852 S.W.2d at 446.

The purpose of a plea to the jurisdiction is to establish a reason why the merits of the plaintiff's claim should not be reached. *See Bland Indep. Sch. Dist.*, 34 S.W.3d at 554. However, "a court deciding a plea to the jurisdiction is not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised." *Id*. at 555. The court should, however, "confine itself to the evidence relevant to the jurisdictional issue." *Id*. "Whether a determination of subject-matter jurisdiction can be made in a preliminary hearing or should await a fuller development of the merits of the case must be left largely to the trial court's sound exercise of discretion." *Id*. at 554. The "ultimate inquiry" in a challenge to the trial court's jurisdiction is whether the facts pled by the plaintiff and not negated, taken as true, and liberally construed "affirmatively demonstrate a claim or claims within the trial court's subject-matter jurisdiction." *Brantley v. Tex. Youth Comm'n*, 365 S.W.3d 89, 94 (Tex. App.—Austin 2012, no pet.); *see also Jud*, 184 S.W.2d at 823 (holding that determination whether plaintiff-fireman had alleged cause of action against members of pension fund board, so that trial court had jurisdiction over that claim, could not be determined "in limine on a hearing of the plea to the jurisdiction" but must await development of facts).

20

When a plaintiff fails to demonstrate a waiver of immunity from liability by the defendant, and thus fails to state a cause of action upon which the relief sought can be granted, and his claim cannot be repled to state a cause of action, the trial court should not permit repleading but should dismiss the suit. *See Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 378 (Tex. 2006) (holding that where plaintiff Reata failed to demonstrate waiver of City's immunity from liability under Tort Claims Act plaintiff's claims were properly dismissed and plaintiff was not entitled to replead); *see also Brantley*, 365 S.W.3d at 94 (stating that where pleadings affirmative negate existence of jurisdiction, plea to jurisdiction may be granted without allowing plaintiff opportunity to amend).[3]

---

[3] The majority argues that the issue of Jesus's immunity to Byles's claims is not jurisdictional, was not preserved, and, therefore, cannot be addressed by this Court on appeal. Slip Op. at 13–14 (citing *Harris Cnty Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 842 (Tex. 2009) and *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004)). The cases cited by the majority distinguish between immunity from suit and immunity from liability in the context of *sovereign* immunity. In a sovereign immunity case, the issue of immunity from liability is typically not reached unless the State has already waived immunity from suit. Therefore, the court's jurisdiction to entertain the suit is generally already established and all that is at issue is the jurisdiction to enter the judgment. The supreme court has consistently held that, even when the issue is sovereign immunity, immunity from liability may protect the state from suits for money damages even though it does not protect against other suits. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 371–73 (Tex. 2009). Likewise, the courts have consistently held that when a private citizen's immunity from liability is established, the case should be dismissed for failure to state a claim upon which relief can be granted. *See Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 405–07 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (dismissing case against attorneys immune from civil liability for actions taken in connection with representation).

21

Here, the trial court heard evidence of the jurisdictional facts upon which Jesus's affirmative defense of immunity was based only during the trial on the merits of Byles's defamation claim. The jurisdictional evidence included evidence as to what Jesus said, to whom he said it, and when and under what circumstances it was said. This evidence went to the fact of Jesus's immunity from liability and, therefore, to Byles's statement of a claim for which Jesus could be held liable and to the trial court's jurisdiction to try Byles's defamation suit and to render a money judgment against Jesus. The jurisdictional issue should have been heard first and the trial court's jurisdiction to proceed to trial on the merits determined preliminarily. This did not happen.

Had the trial court heard the jurisdictional facts first, it is inconceivable to me that a reasonable judge would have permitted Byles's defamation suit against Jesus to proceed to trial on its merits. On October 5, 2007, L.S. made an outcry that she had been sexually abused by Byles and described with gestures what he had done. Section 261.106(a) provides that "[a] person acting in good faith who reports or assists in the investigation of a report of alleged child abuse or neglect or who testifies or otherwise participates in a judicial proceeding arising from a report, petition, or investigation of alleged child abuse or neglect is immune from civil or criminal liability . . . ." TEX. FAM. CODE ANN. § 261.106(a). No one denied that the outcry was made on October 5 and that neither L.S.'s mother

22

Valerie, her aunt Vanessa, nor her grandmother Lisa initially reported the outcry to authorities. Only Jesus, to whom the incident was reported by Valerie, insisted that L.S. be taken to CAC to be examined. In other words, only Jesus obeyed the mandate of section 261.101 that "[a] person having cause to believe that a child's physical or mental health or welfare has been adversely affected by abuse or neglect by any person shall immediately make a report as provided by this subchapter." *Id.* § 261.101(a). All of the other persons with knowledge of the outcry disregarded his or her statutory duty. By contrast, when Valerie agreed to take L.S. to be examined three days later, on October 8, the hospital immediately followed its own mandate under section 261.101(b) by reporting the outcry to CPS and the Austin County Sheriff's office. *See id.* § 261.101(b). Both CPS and the Austin County Sheriff's Department began investigations.

During her first interview at the hospital on October 8, 2007, L.S. reaffirmed her outcry to medical personnel, naming Byles as the perpetrator. Although medical personnel were unable to perform a physical examination, due to L.S.'s refusal to cooperate, the physician did confirm to Valerie that L.S. had named Byles, and Valerie reported that information to Jesus.

The CPS and Austin County Sheriff's Department investigations were hampered by L.S.'s removal from the house and the county. However, Jesus continued to urge that L.S. be taken back to the CAC for a physical examination.

23

In short, he was the only family member who showed an active interest in cooperating with an ongoing investigation into child sexual abuse by appropriate authorities.

Jesus succeeded in getting Valerie to take L.S. back to the CAC on October 22, 2007, where a second interview was conducted, in which L.S. again named Byles. A physical examination was also performed, but it was inconclusive as to whether L.S. had been assaulted. The medical records are not in the record of this case. However, the January 5, 2008 CPS "Investigation Report" is in the record. It records notes entered by CPS on October 22, 2008, in accordance with the mandate of section 261.001(b).

It is unclear from the record where L.S. was or with whom she was living in October and November 2007. The investigations by CPS and the Austin County Sheriff's Department stalled. Jesus, however, persisted, and Lisa subsequently contacted CPS through her attorney and told them that L.S. was living with her in Houston. That information led to interviews of family members by a CPS investigator in December 2007 and January 2008 and also to Austin County's dropping the investigation because L.S. was now out of its jurisdiction. Lisa also initiated custody proceedings in Harris County seeking to obtain custody of both L.S. and her younger brother, F.S.

The January 5, 2008 CPS "Investigation Report" includes the investigator's report of her interviews with Valerie and other family members. The report records Valerie's statement that L.S. had told her that Byles had "fondled" her and had shown her by gestures what he had done. It also includes the statement that Valerie "stated that the doctor stated that there was discharge[] but it was inconclusive if there was sexual abuse." Lisa and all other family members reported that Byles had been kept away from L.S. after her outcry.

The first statement the trial court found to be defamatory, and on which Jesus's liability is predicated—the December 12, 2007 statement in a voicemail message to Lisa that "[Stephen's] hands on your granddaughter's vagina isn't what dictates this"—was made after L.S. had repeated her outcry several times, after medical personnel were unable to determine whether L.S. had been sexually assaulted, after Lisa had initiated custody proceedings, during the active CPS investigation of the case, and before the hearing on Lisa's custody suit.

The second statement the trial court found to be defamatory— "a statement to Juan Miranda that a doctor had examined L.S. and that the doctor had confirmed that L.S. had been sexually molested by [Stephen Byles]"—was made "[i]n January 2008" to Jesus's brother, also L.S.'s great-uncle. While no exact date is attributed to the second statement, and no context is given for it, it appears that this statement occurred before the January 8, 2008 hearing on Lisa's custody suit. Juan

25

testified in his deposition that this was the only time he talked with Jesus about L.S.'s complaint, that he had already heard about the complaint from his other brothers, who said Jesus had heard a tape of the CAC interview with L.S. (which was not introduced into evidence as proof of the falsity of Jesus's alleged comment), and that the family was deeply divided over whether Byles had sexually assaulted L.S.

If Jesus's unrecorded statement to Juan was not made before the January 8 hearing, it was necessarily made before or within two days after the family court's January 29, 2008 order that awarded custody of L.S. to Lisa and enjoined her from allowing Byles to be around L.S. and F.S. It was also made in the same month as the final CPS Investigation Report, completed January 5, 2008, which recorded interviews with Valerie, Vanessa, and Lisa, all of whom acknowledged and described L.S.'s outcry. And it was made in the same month in which CPS concluded that reports of neglectful supervision by Valerie and Lisa of L.S. and F.S. and of sexual abuse by Byles of L.S. and F.S. were "Ruled Out with factors controlled UTD [unable to determine] for SXAB [sexual abuse] on for [L.S.]."

Jesus's second reported statement was also made in the same month as CPS's "Risk Assessment Report." This report included the same results of the various investigations as the Investigation Report, noted that Byles had been kept away from the children after L.S.'s outcry, and concluded, "Significant risk factors

26

were identified, but family strengths and available resources are sufficient to provide for the child(ren)'s safety for the foreseeable future." These risk factors were deemed significant enough by the trial court to support an injunction on January 29, 2008, preventing Lisa from allowing Byles to be around the children until further order of the court.

Upon hearing the evidence regarding Jesus's immunity, along with all the other evidence, in what appears to have been a highly emotionally charged trial involving all—and only—family members, the trial court found that "[n]either the Defamatory Statements nor [other statements] were made while assisting in the investigation of a report of alleged child abuse or neglect or while testifying or otherwise participating in a judicial proceeding arising from a report, petition, or investigation of alleged child abuse or neglect," and it concluded as a matter of law that Jesus was not immune from liability under section 261.106.

The trial court's conclusion that Jesus was not immune for his statements under section 261.106 followed directly from its finding of fact that the Defamatory Statements were not made while assisting in the investigation of a report of alleged child sexual abuse. In my view, this conclusion is rationally unsustainable under the facts of this case.

A trial court's conclusions of law are reviewed de novo. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). The sufficiency of the

27

evidence supporting a trial court's challenged findings of fact following a bench trial is reviewed under the standards used to review the legal or factual sufficiency of the evidence supporting jury findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). When the appellate record includes the reporter's record, the trial court's factual findings, whether express or implied, are not conclusive and may be challenged for legal and factual sufficiency. *See Middleton v. Kawasaki Steel Corp.*, 687 S.W.2d 42, 44 (Tex. App.—Houston [14th Dist.]), *writ ref'd n.r.e.*, 699 S.W.2d 199 (Tex. 1985). The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In reviewing a factual sufficiency challenge, the appellate court considers and weighs all the evidence supporting and contradicting the challenged finding and sets the finding aside only if the evidence is so contrary to the overwhelming weight of the evidence as to make the finding clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). In my view, a reasonable and fair-minded fact finder could not have found that Jesus's comments to Lisa and to his brother Juan during the CPS investigation of L.S.'s outcry were *not* made while Jesus was assisting in the investigation of a report of child abuse. Therefore, I would hold that the evidence supporting the trial court's finding of fact was so weak as to make its finding clearly wrong and manifestly unjust. And I would

hold that the trial court's conclusion of law number sixteen was, therefore, erroneous.

It is also inconceivable to me that a "reasonable and fair-minded" court could find, on the basis of the evidence in this case, that Jesus was anything other than "[a] person acting in good faith who report[ed] or assist[ed] in the investigation of a report of alleged child abuse or neglect or who . . . otherwise participate[d] in a judicial proceeding arising from a report, petition, or investigation of alleged child abuse or neglect" or that it could find that the two statements on which the trial court predicated Jesus's liability were outside the scope of the protection extended to such persons by section 261.106(a). *See* TEX. FAM. CODE ANN. § 261.106(a), (c); *City of Keller*, 168 S.W.3d at 827.

There is no evidence of Jesus's "bad faith or malicious purpose" in urging the investigation of L.S.'s outcry. Jesus Miranda, alone among the many family members aware of L.S.'s outcry, was the only one who took seriously the mandate of section 261.101 that persons "having cause to believe that a child's physical or mental health or welfare has been adversely affected by abuse or neglect by any person shall immediately make a report as provided by this subchapter" and the only one who urged that a report be made to authorities about L.S.'s outcry. TEX. FAM. CODE ANN. § 261.101(a). Upon investigation by the CAC, the Austin County Sheriff's Department, and CPS, the evidence that Byles had assaulted L.S.

29

was found by CPS to be "significant" enough to support a finding of "unable to determine," together with a conclusion that the risk was "significant" but "controlled" because Byles had been kept away from L.S. since the date of the outcry. The evidence was also found by the family court to be sufficient to support an order on January 29, 2008, enjoining Lisa from allowing Byles to be around L.S. "until further order of the court."

I would hold that the trial court erred in finding that Jesus was not immune from liability for defamation for his statements under Family Code section 261.106. I would further hold that the trial court erred in not hearing the jurisdictional facts pertinent to Jesus's immunity defense before proceeding to trial on the merits of Byles's defamation suit and entering judgment on Byles's claim rather than dismissing Byles's suit for lack of jurisdiction due to Byles's failure to state a claim upon which relief could be granted. *See Miranda*, 133 S.W.3d at 223; *see also Brown*, 13 S.W. at 472–73 (holding that no judgment can be rendered against defendant who cannot be held liable); *Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 405–07 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (affirming dismissal for failure to state cause of action after law firm establish defense of qualified immunity). Accordingly, I would vacate the judgment of the trial court and dismiss the case.

In my opinion, this case presents fundamental jurisdictional error. *See*

*McCauley v. Consol. Underwriters*, 304 S.W.2d 265, 266 (Tex. 1957) (per curiam) (holding error to be fundamental when record shows jurisdictional defect). The record clearly shows that Jesus was held liable to Byles for civil damages for defamation in a suit brought against him for his remarks made to family members during an ongoing investigation by CPS, medical authorities, and police of an outcry of sexual abuse by a three-year-old child against Byles. A trial for defamation and a money judgment in favor of a person against whom an outcry of child sexual abuse is made and against a person who urges family members to investigate the outcry has a potentially deeply chilling effect on the reporting of child sexual abuse to persons in a position to investigate the allegations. This suit thus directly undermines the fundamental purpose of the "Protection of the Child Act," Family Code Chapter 261, which is to protect children from abuse and neglect. *See* TEX. FAM. CODE ANN. §§ 261.101, 261.106 (imposing duty to report suspected child abuse or neglect and child sexual abuse and providing immunity for report).

In support of treating this case as one of fundamental jurisdictional error, I stress that I find absolutely no evidence in the record that Jesus's report was made in bad faith, despite Byles's emotional briefing on appeal and on rehearing, and despite what appears to have been a circus atmosphere involving all family

31

members in the courtroom. The reporting of suspected child abuse is an extremely serious issue, and it was precisely to protect persons who make such reports and to ensure that they will freely report actual outcries of child abuse and will not be punished for their good-faith reports that the immunity statute was passed. The further purpose of that statute is to ensure that threats to the economic well-being—and reputation—of persons who report suspected abuse in good faith will not succeed and will not be rewarded with large financial awards, even if, as here, the sanctions placed on the purported abuser by child protection authorities on the basis of professional evaluations by CPS, medical personnel, and law enforcement authorities are ultimately lifted.

My conviction that this is a case of fundamental jurisdictional error is strengthened by the fact that the majority in this case, after reviewing the record, can find only one statement by Jesus that it concludes supports a defamation finding. For the reasons argued in the next section, I find that lone statement to be privileged, and, even if it were not privileged, it is not a statement of fact that could be or was objectively shown to be false. Rather, it is an undated, unspecific hearsay statement of opinion reportedly made by Jesus to his brother, Juan, that the doctor to whom L.S. was taken following her outcry had stated that the child had been sexually assaulted by Byles. Even if that statement were not privileged, and were not hearsay reported only in Juan's deposition, the burden in a defamation

suit would have been on Byles to show exactly what Jesus said, that it was a statement of fact, and that, in fact, the doctor reported that the child was not sexually assaulted or was not assaulted by Byles, that Jesus saw the report and knew for a fact that what he said was false, and that he said it anyway—outside the family and investigatory process—for the purpose of injuring Byles's reputation. There was absolutely no such showing by Byles. Indeed, the tape of L.S.'s CPS interview and her medical records, which might have shown whether Jesus even made a false report, were never introduced into evidence by Byles in support of his defamation claim.

My arguments and authorities on the merits of Byles's defamation claim are set forth below.

**Defamation**

Were I to reach the merits of Byles's defamation claim, I would sustain Jesus's second issue, and I would reverse the judgment of the trial court and render judgment that Byles take nothing by his claim.

In his second issue, Jesus argues that the trial court erred in holding that he defamed Byles because "at least one of the allegedly defamatory statements, uttered by [Jesus], is inherently incapable of objective verification or disproof," and, therefore, Byles cannot prove defamation. I would hold that Jesus's statement to Lisa is incapable of objective verification or disproof and that neither that

33

statement nor his statement to Juan was shown to be a false and defamatory statement of fact made without legal excuse, as required for Byles to carry his burden of proof.

### A. *Legal Excuse*

"Slander is a defamatory statement that is orally communicated or published to a third person without legal excuse." *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995). In *Randall's*, the Texas Supreme Court developed the doctrine of legal excuse in the employer/employee context. It held that "an employer has a conditional or qualified privilege that attaches to communications made in the course of an investigation following a report of employee wrongdoing." *Id*. "The privilege remains intact as long as communications pass only to persons having an interest or duty in the matter to which the communications relate." *Id*. The privilege can be defeated only by proof that a statement was motivated by actual malice existing at the time of publication. *Id*. "In the defamation context, a statement is made with actual malice when the statement is made with knowledge of its falsity or with reckless disregard as to its truth." *Id*.

In *Randall's*, store employees communicated to each other that a customer had left the store without paying for a wreath. *Id*. at 646. The customer admitted that fact but said she did not have the intent to steal. *Id*. The statement was

34

communicated to several managers on duty on the night of the incident, the security guard who investigated the incident, the assistant store manager, the director of the store, the district manager for the store, and the vice president of Randall's human resources. *Id*. at 647. The supreme court observed that "all of the employees who gave or received statements about the wreath incident had an interest or duty in the matter." *Id*. It held, "Randall's established an absence of malice with regard to these statements by conclusively proving that its employees had reasonable grounds to believe that their statements were true." *Id*. (citing *Casso v. Brand*, 776 S.W.2d 551, 558 (Tex. 1989)).

Similarly, in this case, Jesus satisfied the criteria set out in *Randall's* for attachment of a legal excuse by meeting the requirements for immunity from civil liability under Family Code section 261.106. Both statements were "communications made in the course of an investigation following a report of . . . wrongdoing." *Id*. at 646. Both were communications made only to "persons having an interest or duty in the matter to which the communications relate[d]." *Id*. Nor was there any evidence that the statements were made with "actual malice," i.e., "knowledge of [their] falsity or with reckless disregard as to [their] truth." *Id.*

Jesus's statements followed L.S.'s repeated outcries; they followed the statement made to him by Valerie after the October 8, 2007 interview that L.S. had

made an additional outcry to the medical personnel who had interviewed her and had named Byles as the perpetrator of the assault; and they followed the report made to him by Valerie after the physical examination of L.S. on October 22 that the physician had stated he was unable to determine whether L.S. had been sexually assaulted by Byles. Also during this time period, CPS issued a report that included Valerie's statement that "the doctor stated there was discharge[] but it was inconclusive if there was sexual abuse"; two CPS reports ruled out allegations of neglectful supervision by Valerie and Lisa, but stated that the investigators were "unable to determine" whether Byles had sexually assaulted L.S., and therefore found "significant risk factors" in L.S.'s living with Lisa, but found that those risk factors were controlled by Lisa's prohibiting Byles from being around L.S.; and the family court granted custody of L.S. and F.S. to Lisa, but also enjoined her from allowing Byles to be around the children until further order of the court. There is no evidence that Jesus's statements were made with knowledge of their falsity or with reckless disregard as to their truth. *See id.* Nor was any evidence introduced—such as the tape of the CPS interview of L.S.—that might have shown Jesus's statements to be, indeed, false statements of facts. Thus, because Jesus's comments were made in the course of his "assist[ing] in the investigation of a report of alleged child abuse" or "otherwise participat[ing] in a judicial proceeding arising from a report . . . or investigation of alleged child abuse," I would find that

36

his communications were statutorily protected and therefore legally excused. *See* TEX. FAM. CODE ANN. § 261.106(a); *Randall's*, 891 S.W.2d at 646.

Even if Jesus had failed to establish a legal excuse for his statements under section 261.106, however, I would still hold that the first statement to Lisa was not an objectively verifiable statement of fact as a matter of law and that Byles did not prove that the second statement to Juan was a false statement of fact.

## B. Lack of Objective Verifiability

To establish defamation, the plaintiff must prove that the defendant published a false statement of fact. *See El-Khoury v. Kheir*, 241 S.W.3d 82, 85 (Tex. App.—Houston [1st Dist.] 2007, pet. denied); *AccuBanc Mortg. Corp. v. Drummonds*, 938 S.W.2d 135, 149 (Tex. App.—Fort Worth 1996, writ denied) ("Defamation involves the publication of a false statement of fact about the plaintiff."). To succeed on a defamation claim, a plaintiff must demonstrate that (1) the defendant published a factual statement (2) that was capable of defamatory meaning (3) concerning the plaintiff (4) while acting with either negligence, if the plaintiff is a private individual, or actual malice, if the plaintiff is a public figure or public official, concerning the truth of the statement. *Vice v. Kasprzak*, 318 S.W.3d 1, 12 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998)). "[A] private individual may recover damages from a publisher or broadcaster of a defamatory falsehood as

compensation for actual injury upon a showing that the publisher or broadcaster knew or should have known that the defamatory statement was false." *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809, 811, 819 (Tex. 1976); *A.H. Belo Corp. v. Rayzor*, 644 S.W.2d 71, 80, 82–83 (Tex. App.—Fort Worth 1982, writ ref'd n.r.e.).

By contrast to false statements of fact injurious to reputation, all assertions of opinion are protected by the First Amendment of the United States Constitution and Article 1, Section 8 of the Texas Constitution. *Carr v. Brasher*, 776 S.W.2d 567, 570 (Tex. 1989); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S. Ct. 2997, 3007 (1974) (stating, "Under the First Amendment there is no such thing as a false idea. . . . But there is no constitutional value in false statements of fact."). To put it another way, a plaintiff, to establish a cause of action for libel, is required to prove that "the defendant published a false, defamatory statement of fact, rather than an opinion," or "[i]n other words, the plaintiff must prove that the statements contained false, defamatory facts rather than opinions or characterizations." *Columbia Valley Reg'l Med. Ctr. v. Bannert*, 112 S.W.3d 193, 198 (Tex. App.—Corpus Christi 2003, no pet.).

Whether a statement is an opinion or a statement of fact is a question of law for the courts. *Carr*, 776 S.W.2d at 570; *Bannert*, 112 S.W.3d at 198. The threshold issue of whether words are capable of defamatory meaning is also a

38

question of law for the courts. *Turner v. KTRK Television, Inc.* 38 S.W.3d 103, 114 (Tex. 2000); *Vice,* 318 S.W.3d at 17*; Bannert*, 112 S.W.3d at 198. The courts construe the statement as a whole in light of the surrounding circumstances based on how a person of ordinary intelligence would perceive it. *Vice*, 318 S.W.3d at 17; *Bannert*, 112 S.W.3d at 198. The test as to whether words or statements are defamatory is the reasonable person test. *Vice*, 318 S.W.3d at 17. "The analysis for distinguishing between an actionable statement of fact and a constitutionally protected expression of opinion focuses on the statement's verifiability and the entire context in which it was made." *Id*. at 18. A statement is capable of defamatory meaning if it is both false and injurious to the reputation of the person about whom it is made. *See Casso v. Brand*, 776 S.W.2d 551, 554 (Tex. 1989); *see also Gertz*, 418 U.S. at 339–40, 94 S. Ct. 2997, 3007; *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S. Ct. 710, 726 (1964).

In this case, as the majority states, "There is no evidence in the record that this matter was being discussed by anyone other than the officials in charge of the various investigations, and Lisa's family." Slip Op. at 20. Therefore, this is a private person/private person defamation case, and Byles, as the plaintiff, had the burden of proving that the statements upon which he based his defamation claims were objectively verifiable statements of fact, that they were false and injurious to his reputation, and that they were made negligently, i.e., were below the standard

39

of care of an ordinary person making such a statement, given the entire context of the statement—assuming they were not protected by section 261.106 as statements made by Jesus in good faith in the course of assisting in the investigation of a report of child abuse, i.e., L.S.'s outcry. *See* TEX. FAM. CODE ANN. § 261.106(a).

The first statement, "Stephen's hand on your granddaughter's vagina isn't what dictates this," is plainly not a verifiable statement of fact, but a statement of opinion or characterization. *See Bannert*, 112 S.W.3d at 198. As such, it is constitutionally protected speech. *See Gertz*, 418 U.S. at 339–40, 94 S. Ct. at 3007; *Carr*, 776 S.W.2d at 570.

In the case of the second statement, neither the content nor the entire context of the statement is objectively verifiable. Nor was the statement shown to be a false statement of fact. *See Vice*, 318 S.W.3d at 18. The out-of-court unrecorded statement by Jesus was made approximately two years before Juan's deposition, in which Juan testified as follows:

Q: What statement did Mister—or what statements did Jesus make about [Byles] to put him in a negative light?

A: That he had molested one of my—my niece's kids.

Q: And who did he—well, strike that. Which child?

A: [L.S.]

. . . .

Q: Okay. And when in time was it that Jesus made this statement to you?

40

A:   This was in January—I believe January of '08.

Q:   Okay.  And how did the statement come about?  Did he call you, or was it in person?

A:   It was a telephone call.

Q:   Okay.  And he called you and said what?

A:   That, you know, he knew that Steven had done—had molested that—[L.S.]

Q:   Did he express it as an opinion that he thought the child had done—that Steven had done this, or that he expressed it as a fact?

A:   That he knew.

Q:   Did he—did Jesus report to you that he had reported to others negative comments about [Byles]?

A:   That he had reported to other family members that—right there and then he did not state that he had told anybody else, no.

Q:   Okay.  And did you later come into any information that that had happened?

A:   Yeah.

Q:   What information did you receive?

A:   From one of my brothers that had come over to my house and they told me that *he had already heard a recording* and that they knew that, that she has been molested according to—

Q:   And where did they get that information from?

A:   My brother.

Q:   And your brother, you're talking about your brother, Jesus, reported it to what other family members?

A:   My brother Gabriel and my brother Andy as far as I knew because they had came and told me.

(Emphasis added.) The recording that Juan testified Jesus had heard was not introduced into evidence by Byles as proof of the falsity or recklessness of Jesus's report.

As it is, this testimony does not even support the trial court's finding that Jesus had told Juan "that a doctor had examined L.S. and that the doctor had confirmed that L.S. had been sexually molested by [Stephen Byles]." The closest Juan's deposition testimony comes to conforming to the finding of fact by the trial court is the following:

> Q: Okay. Now, did Jesus make any statements to you with regards to whether or not [L.S.] had been taken to a doctor with regards to the sexual abuse claim?
>
> A: Yes. Yes. Because I—I really hadn't known that she went until he told me.
>
> Q: And what did he tell you about the doctor appointment?
>
> A: That she was a—confirmed that she was molested.
>
> Q: That a doctor had confirmed that she had been sexually molested by [Byles]?
>
> A: Yes.
>
> Q: And he told you that in the same conversation?
>
> A: That was the only conversation I had with him.

In this deposition testimony, Juan did no more than confirm words put in his mouth by Byles's attorney after he had failed to use those words in his initial deposition testimony. However, even if the content of Jesus's statement is taken to be what the trial court found it to be—that Jesus told Juan that a doctor had

42

confirmed that L.S. had been sexually molested by Byles—this statement is not shown by anything in the record of this case to be false. Byles had the burden of establishing the falsity of Jesus's statement, and he failed to include in the record either the tape of the CAC interview, which Juan testified Jesus had heard, or L.S.'s medical records that might have shown that Jesus's report was false. Therefore, Byles failed to carry his burden of proof. *See Foster*, 541 S.W.2d at 811; *El-Khoury*, 241 S.W.3d at 85; *AccuBanc Mortg.*, 93 S.W.2d at 149. Moreover, Valerie's statement that the doctor reported to her on October 22, 2007, that "there was discharge[] but it was inconclusive if there was sexual abuse" tends to confirm the substantial truth of the statement, or, at least, tends to negate the statement's having been made recklessly and with disregard of its truth or with actual knowledge of its falsity.

Furthermore, because Jesus's statement to Juan was supported by evidence deemed credible enough by both CPS and the family court to justify a court order enjoining Lisa from allowing Byles to be around L.S., it cannot be said that Jesus's statement was unreasonable or that his statement was made in bad faith. *See Vice*, 318 S.W.3d at 17 (setting out reasonable person test); TEX. FAM. CODE ANN. § 261.106(c) (stating that immunity does not extend to statements made in bad faith).

43

Were I to reach the merits of Byles's defamation claim, I would hold that Jesus's statement to Lisa was either an expression of Jesus's opinion or his characterization of what he had been told by Valerie and had heard on the recording and that Byles did not prove that Jesus's statement to Juan was false. *See Bannert*, 112 S.W.3d at 198. Nor did Byles show that the statements on which Jesus's liability was predicated were made negligently or with reckless disregard for the truth. Rather, they were made in the context of the investigation of an outcry which Jesus and all persons with knowledge were required by Family Code section 261.101 to report, and they have evidentiary support in the record. Therefore, even if I did not believe, as I do, that the trial court's entry of a judgment against Jesus for damages for defamation was barred by Jesus's statutory immunity from civil liability under Family Code section 261.106, I would hold that the trial court erred in entering judgment in favor of Byles on his defamation claims.

Accordingly, I would sustain appellant's second issue.

**Conclusion**

This is a case of fundamental jurisdictional error. I believe the trial court erred in trying appellant Jesus Miranda's defense of immunity from liability under Family Code section 261.106 for statements made to family members during the course of an investigation of alleged child sexual abuse simultaneously with its

44

trial of the merits of appellee Stephen Byles's defamation suit against Jesus based on those statements; that it erred in finding Jesus not to be immune from liability for his statements; and that it erred in exercising jurisdiction over the merits of Byles's defamation claim and in rendering a judgment for damages against Jesus on that defamation claim.

I would hold that Jesus was immune from civil liability on Byles's defamation claim under Family Code section 261.106. Therefore, the trial court should have granted Jesus's claim of immunity from liability, and it should have dismissed Byles's defamation claim for failure to state a claim upon which relief could be granted.

Even if I were to find that Jesus was not immune from liability for his statements and that, therefore, the trial court did have jurisdiction to enter a money judgment against him for defamation, I would still find that the single hearsay statement allegedly made by Jesus to his brother that the majority agrees is defamatory was not shown to be a false statement of fact capable of supporting a judgment for liability for defamation. Accordingly, I respectfully dissent from the majority's opinion and judgment affirming the trial court's judgment.

I would vacate the judgment of the trial court and render the judgment the trial court should have rendered, dismissing the case for lack of jurisdiction. Alternatively, I would reverse and render judgment that Byles take nothing by his claims.



                                 Evelyn V. Keyes
                                 Justice

Panel consists of Justices Keyes, Higley, and Massengale.

Justice Keyes, dissenting.