**COLUMBIA VALLEY REGIONAL MEDICAL CENTER, Charles Sexton, and Rhue LaMont, Appellants,**

v.

**Julie BANNERT, Appellee.**

**No. 13–01–095–CV.**

Court of Appeals of Texas, Corpus Christi–Edinburg.

July 10, 2003.

Motion for Rehearing En Banc Overruled Aug. 21, 2003.

Rehearing Overruled Aug. 25, 2003.

Harvey G. Joseph, Littler Mendelson, Dallas, Nancy L. Patterson, Houston, for appellants.

Ernesto Gamez, Jr., Law Office of Ernesto Gamez, Jr., Brownsville, Larry Zinn, San Antonio, for appellee.

Before Justices YAÑEZ, CASTILLO, and DORSEY.[1]

## OPINION

Opinion by Justice J. BONNER DORSEY (Retired).

This is an action by Julie Bannert against her former employer, Columbia Valley Regional Medical Center ("Columbia"), and two of its managers, Charles Sexton and Rhue LaMont. The action arose after Columbia fired Bannert for dishonesty. Although Bannert alleged numerous causes of action relating to her termination, only defamation was submitted to the jury, which found for Bannert, awarding her over $1.5 million in actual and punitive damages. The supposed defamation occurred in a memorandum dated September 1, 1999, from Rhue LaMont, Columbia's chief nursing officer ("CNO"), to Charles Sexton, its chief executive officer ("CEO"). This document, or "file," appeared on the shared drive of the hospital's computer system and was discovered by a hospital employee under Bannert's supervision. The authenticity of this memorandum, as originating from appellant LaMont, is sharply contested.

Appellants challenge the judgment and verdict by twelve issues. We focus on whether the memorandum was libelous, and whether there is any legally sufficient evidence to support the jury's finding of the vital fact that LaMont authored the memorandum. We hold the memorandum is not libelous as a matter of law and the evidence is legally insufficient that the memorandum was authored by LaMont. We reverse and render judgment that appellee take nothing.

1. Retired Justice J. Bonner Dorsey assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to TEX. GOV'T CODE ANN. § 74.003 (Vernon 1998).

## I. Facts

Bannert was director of perioperative services at Columbia. In that position she reported directly to LaMont, who became Columbia's CNO in June of 1999. LaMont, on touring Bannert's department, noted problems in primarily administrative matters. LaMont initially provided Bannert with an assistant, but she subsequently asked Bannert to be the clinical nurse manager of perioperative services, a lesser position with fewer administrative duties.

On October 20, 1999, LaMont and Joanne Duming, the hospital's director of human resources, met with Bannert to discuss rumors about Bannert circulating in the hospital. Those rumors were that Bannert: (1) used drugs and would go home to take a "hit" and (2) acted inappropriately in the work place, specifically an incident in which she lifted her skirt and revealed her underwear to co-workers. Bannert denied the rumors and demanded to meet her accusers. Infuriated that she had been "ambushed" by the meeting, Bannert also was incensed by the resulting memorandum of November 1, 1999, from LaMont detailing the meeting. A few days later, Bannert responded with her own memorandum to LaMont with a copy to Sexton, Columbia's CEO.

### The September Memo

Michael Catlett worked for Bannert in the hospital as an operating-room scheduler. His wife also worked as an operating room nurse under Bannert's supervision. He testified that on November 12, 1999, while using the hospital computer's "shared drive" (the "S" drive), he opened a file and read the following memorandum:

To: Charles Sexton

From: Rhue Lamont

CC:

Date: 09/01/99

Re: Perioperative Services

As we discussed on 08/28/99, I have attempted to find cause for the dismissal of J. Bannert. **She does not meet my ideal as a director and the apparent lack of discipline in her department is an affront to the professionalism I expect in any department under me.** Her professional duties however have resulted in nothing we can use to relieve her of the position. My attempts to overload her with extra duties and assigned tasks have not only failed to frustrate her into resignation, but personnel working under her have rallied to help her with the added work. This in spite of pressures to reduce FTE's and hours. Repeated requests to step down from her current position have resulted in refusal. **I will now attempt to gain her resignation by creating rumors for un-professionalism, substance abuse, lewdness, and will enlist Human Resources in documenting the allegations in her Personnel Record.** Due to her short temper confronting her with these allegations should result in either, her anger or her resignation, or at least grounds for probation; for which we should then be able to find any reason for her dismissal.

If these tactics do not work, we will have to dismiss her without cause and deal with the consequences as they arise.

I believe that due to her long standing relationship with the surgeons her dismissal would result negatively for Columbia/HCA. I have attempted to reduce the effect this may have on services by increasing her workload and time outside of her department, and there-by decreasing the amount of time for direct contact with the surgeons and staff. This will in effect ease her out and open the window for problems to develop.

These problems I can then document as her inability to manage.

Employees loyal to her will probably leave on a wide level, following her to another position in another local organization, resulting in an immediate lack of care, and a reduction in services until replacements could be found. For this reason **we must *document* her un-professionalism and behavior** and disseminate it widely within the local community to reduce the possibility of her finding another position where her current personnel would be able to migrate immediately. Once divided we should be able to eliminate, as necessary, those personnel that do not conform to my standards.

If these tactics work, we should be able to bring in the new director before Jan. 1, and complete the re-organization of this facility, bringing it up to my standards. I will continue to keep you informed as always.

(Bold emphasis added; underline in original.)

Catlett copied the memo to a diskette and gave a copy of the memo to Bannert. She in turn gave the memo to Tamara Cowen, Columbia's ethics compliance officer. Cowen notified legal counsel and Sexton, who denied knowledge of the memo and told her to investigate it. Cowen asked Rocky Lopez, Columbia's director of information systems, to find the source of the memo. He concluded that the memo originated from Bannert's office computer.

At trial, LaMont, Bannert, and Catlett each denied writing the memorandum. Sexton denied receiving it. Bannert initially told Cowen she had found a copy of the memo under her door when she came to work on Monday, November 15, but later said she found it on her desk. She finally admitted that Catlett had handed it to her. Bannert was fired for dishonesty after Lopez's investigation revealed the memo came from her office computer and was placed on the shared drive.

## II. The Verdict.

In answering the first question the jury found that Sexton and LaMont "proximately caused the defamation of Julie Bannert." The jury charge defined both slander and libel and instructed the jury regarding what constitutes a cause of action for defamation. In its second answer, the jury found that Sexton and LaMont's conduct was within the "course and scope" of their authority with Columbia. The jury found damages resulting from the defamation to be $10,000 for mental anguish, past and future, $1,000,000 for damage to reputation, past and future, and $28,000 for loss of income, past and future. The jury found that the memorandum dated September 1, 1999, was not subject to a qualified privilege, and that the harm to Bannert resulted from malice and that the defamation was defamation "per se." Exemplary damages were assessed against Columbia in the amount of $500,000.

## III. Analysis

By their first issue, appellants argue the September memo is not defamatory as a matter of law. By issue six, they argue there is no evidence to support the jury's findings that LaMont or Sexton authored, published, or disseminated defamatory statements of any kind. In considering a "no evidence," "insufficient evidence," or an "against the great weight and preponderance" point of error we follow the well-established tests set forth in *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex.1986); *Dyson v. Olin Corp.*, 692 S.W.2d 456, 458 (Tex.1985); *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981) (per curiam); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965); *see* Calvert, *No Evidence*

*and Insufficient Evidence Points of Error,* 38 Tex. L.Rev. 361 (1960).

Bannert testified she was defamed only by the written memorandum dated September 1, 1999, and specifically identified statements in it as libelous.

## A. Are The Statements Libelous?

Libel is a written defamation that tends to "injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury." Tex. Civ. Prac. & Rem.Code Ann. § 73.001 (Vernon 1997).

■■■ The First Amendment to the United States Constitution and article 1, section 8 of the Texas Constitution require a plaintiff to establish that the defendant published a false, defamatory statement of fact, rather than an opinion, as an essential element of a cause of action for libel. *A.H. Belo Corp. v. Rayzor,* 644 S.W.2d 71, 79 (Tex.App.-Fort Worth 1982, writ ref'd n.r.e.); *see Carr v. Brasher,* 776 S.W.2d 567, 570 (Tex.1989). In other words, the plaintiff must prove that the statements contained false, defamatory facts rather than opinions or characterizations. *A.H. Belo Corp.,* 644 S.W.2d at 80. Whether a statement is an opinion or an assertion of fact is a question of law. *Carr,* 776 S.W.2d at 570.

■■■ The threshold issue of whether the words used are capable of a defamatory meaning is a question of law for the court. *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 114 (Tex.2000); *Musser v. Smith Protective Servs., Inc.,* 723 S.W.2d 653, 654 (Tex.1987). The Texas Supreme Court has long held that the court construes the statement as a whole in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement. *Turner,* 38 S.W.3d at 114; *Musser,* 723 S.W.2d at 655. We view the alleged defamatory statements in their context; they may be false, abusive, unpleasant, or objectionable to the plaintiff and still not be defamatory in light of the surrounding circumstances. *Musser,* 723 S.W.2d at 654; *San Antonio Express News v. Dracos,* 922 S.W.2d 242, 248 (Tex.App.-San Antonio 1996, no writ). Only when the court determines the language is ambiguous or of doubtful import should the jury then determine the statement's meaning and the effect the statement's publication has on the ordinary reader. *Musser,* 723 S.W.2d at 655. An ambiguity exists if there is a question whether the hearer could reasonably understand the statement in a defamatory sense. *Ramos v. Henry C. Beck Co.,* 711 S.W.2d 331, 334 (Tex.App.-Dallas 1986, no writ); *Frank B. Hall & Co., Inc. v. Buck,* 678 S.W.2d 612, 619 (Tex. App.-Houston [14th Dist.] 1984, writ ref'd n.r.e.).

*Musser v. Smith Protective Services* is helpful in understanding these rules. In that case, Smith, the owner of a security firm, wrote a letter to a former client, hoping to reattract that client's business. *Id.* at 653. The letter noted that Musser was Smith's former employee and competitor and read: "When Mr. Musser left us, he was able, as so many of our ex-employees have in the past, to relieve us of certain of our polygraph accounts." *Id.* Based upon that statement, Musser sued Smith for libel. The supreme court concluded the letter was not defamatory as a matter of law. *Id.* at 655. The court stated:

> This language, when read with the letter as a whole, is not ambiguous or of doubtful import. While "relieve us of certain

accounts" is sarcastic and may perhaps be twisted or stretched to imply that Musser was unethical in his departing relationship with Smith, the language is not ambiguous to an ordinary reader. Mr. Yust, to whom the letter was addressed, and Mr. Robert Yuna, a vice-president of Sterling Electronics, testified that Smith's statement seemed to cause doubts regarding Musser's integrity and implied that Musser would steal customer lists. The reactions of Yust and Yuna, however, are not typical of the meaning an ordinary reader would impute to the statement.

*Id.*

 Here, Bannert complains that two statements are libelous *per se*. Classifying a defamatory statement as libel *per se* relieves the plaintiff of the necessity of proving an injury as a result of the statement. *Shearson Lehman Hutton, Inc. v. Tucker,* 806 S.W.2d 914, 921 (Tex.App.-Corpus Christi 1991, writ dism'd w.o.j.). The words are so obviously hurtful that they require no proof that they caused injury in order for them to be actionable. *Knox v. Taylor,* 992 S.W.2d 40, 50 (Tex. App.-Houston [14th Dist.] 1999, no pet.); *see Bradbury v. Scott,* 788 S.W.2d 31, 38 (Tex.App.-Houston [1st Dist.] 1989, writ denied). Certain categories of statements are classified as actionable *per se,* including those statements that are falsehoods that injure one in his office, business, profession, or occupation. *Knox,* 992 S.W.2d at 40; *see Shearson Lehman Hutton, Inc.,* 806 S.W.2d at 922. We review each statement separately that appellee Bannert has identified as libelous. Although the authenticity and authorship of the September 1, 1999, memorandum is disputed by appellants, who challenge the sufficiency of the evidence supporting a conclusion that LaMont wrote it, we will review it consistently with the verdict and assume that she was the author.

### 1. The First Statement

 The first statement identified by appellee is: "the apparent lack of discipline in her [Bannert's] department is an affront to the professionalism I expect in any department under me." This is an opinion by Bannert's supervisor, LaMont, that Bannert does not maintain discipline in the department of perioperative services, which falls short of the professional standards demanded by LaMont. Put in context, this statement is not an attack on Bannert's professionalism as a nurse or a director, but rather an opinion that Bannert is not performing at a level LaMont expects. For example, LaMont writes that her attempts to overload Bannert with extra work did not frustrate Bannert into resignation and that personnel working under Bannert rallied to help her with the added work. This is a testament to Bannert's tenacity and leadership abilities. LaMont's belief that Bannert's dismissal would have negative consequences for the hospital is an acknowledgment that Bannert had a good working relationship with the doctors. The fact that LaMont had to increase Bannert's workload and time outside of her department in order for problems to develop is a compliment to Bannert's management skills, not an attack on her professionalism.

The ordinary reader could not reasonably understand the complained-of statement to have a defamatory meaning. *See and compare Musser,* 723 S.W.2d at 655. Also, Bannert admitted during trial that some of the policies and procedures in her pre-admitting department were not promptly done, therefore admitting the truth of the statement. The statement is not comprised of false, defamatory facts;

rather, it is an opinion or characterization of the way Bannert ran the department.

### 2. The Second Statement

■ The second statement at issue is in bold print below and appears in the following context:

> Employees loyal to her [Bannert] will probably leave on a wide level, following her to another position in another local organization, resulting in an immediate lack of care, and a reduction in services until replacements could be found. For this reason **we must document her unprofessionalism** and behavior and disseminate it widely within the local community to reduce the possibility of her finding another position where her current personnel would be able to migrate immediately.

This paragraph shows that Bannert has many loyal co-workers who will follow her when she leaves Columbia, meaning that Bannert's co-workers believe in her abilities. The phrase "we must document her unprofessionalism" is not a declaration that Bannert is unprofessional and does not accuse her of unprofessional conduct. Bannert testified that the memo did not say she was unprofessional.

The memo as a whole does not accuse Bannert of unprofessionalism, lewdness, or drug use.

The statutory test for libel requires the writing to "expose the person to public hatred, contempt, or ridicule, or financial injury, or to impeach any person's honesty, integrity, virtue, or reputation." TEX. CIV. PRAC. & REM.CODE ANN. § 73.001. The memorandum of September, 1999, contains no language that could reasonably be interpreted as impeaching Bannert's honesty, integrity, virtue, or reputation, nor does it hold her up for contempt or ridicule. It consists merely of her supervisor's opinion regarding her shortcomings that are not

libelous. Based upon a review of the entire memo in light of the circumstances in which it was written, the statements are not reasonably capable of a defamatory meaning. Therefore, as a matter of law, the memo was not defamatory. The trial court erred in submitting any issue to the jury regarding the alleged libelous character of the memo.

### B. Evidence of Authorship of the Memo.

■ Appellants challenge the legal sufficiency of the evidence to support the conclusion that LaMont authored the memorandum at issue. In making such a review of the evidence, we search for any probative evidence in support of the conclusion, and we overrule a "no evidence" point if there is any evidence more than a scintilla to prove a vital fact. *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727 (2003) (per curiam); *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997). If there is more than a scintilla of evidence to support the finding, the legal sufficiency challenge fails. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998).

■ Appellee argues there are two defamatory acts attributed to LaMont: the memo of September 1, 1999, previously held not to be defamatory, and the spreading of rumors throughout the hospital that Bannert engaged in lewd conduct or used drugs. The only evidence that LaMont was the source of the rumors is the same memo to Sexton, where it states, "I will now attempt to gain her resignation by creating rumors for unprofessionalism, substance abuse, lewdness, and will enlist Human Resources in documenting the allegations in her Personnel Record." Whether that memo was written by LaMont was hotly disputed at trial. The sole evidence that it was authored by LaMont was given

by Gerald Alexander, a computer expert for the appellee, who along with two experts for the appellants, examined the computer files seeking the origin of the memo. We conclude there is no evidence to support his conclusion that the memo can be attributed to LaMont, and sustain appellants' sixth issue.

In *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713 (Tex.1998), the Texas Supreme Court adopted the language of *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), and held that there needs to be a connection between an expert's observations and analyses and conclusions. *Id.* at 727.

> Rule 702 contains three requirements for the admission of expert testimony: (1) the witness must be qualified; (2) the proposed testimony must be "scientific ... knowledge"; and (3) the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." TEX.R. CIV. EVID. 702. In order to constitute scientific knowledge which will assist the trier of fact, the proposed testimony must be relevant and reliable. *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex.1999).
>
> **But it is the basis of the witness's opinion, and not the witness's qualifications or his bare opinions alone,** that can settle an issue as a matter of law; a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

*Id.* (emphasis added).

Catlett worked with Bannert in the operating room area as a scheduler. Bannert hired Catlett in May, 1999. His wife was an operating room nurse under Bannert's supervision. He occupied an office next to Bannert's, and he was proficient with computers, having built a number of them for his own use. At home he had both desktop and laptop computers, and one at work that he used for a number of tasks. He testified by videotape that, using the computer in his office on Friday, November 12, 1999, he discovered a document in the hospital's computer's shared drive mentioning Bannert by name. The document was a memorandum dated September 1, 1999, from LaMont to Sexton with the file name "temp mail dot doc." After reading the document, Catlett copied it to a diskette by "dragging and dropping" and took the diskette home. The next day, Saturday, he placed the diskette in his home computer and printed a copy of the document. On Monday, November 15, he returned to work, made four copies of the memo, and showed them first to Cindy Crawford, the charge nurse, and later to Bannert. Catlett gave Bannert all copies of the memo he had made. Later, sometime after November 23, he gave the diskette to Bannert's lawyers at her request. He testified that he never transferred the memo onto the hard drive, the "C" drive, of his computer at Columbia, that he did not write the memo, and that he did not know who did.

The same day Catlett gave her the memo, November 15, Bannert gave a copy to Cowen, Columbia's ethics compliance officer. Cowen in turn notified legal counsel and Sexton, who told Cowen to investigate the matter. She contacted Lopez, the hospital's information system director and a computer programmer, and asked him to conduct an investigation of the source of the memo.

Lopez, after examining the computers in the hospital used by LaMont, Bannert, Catlett, Sexton, and the "S" drive, concluded it originated on Bannert's hospital computer, but also found it on Catlett's office computer. He examined the back up tapes of the shared drive to see if it had

been in that drive of the system shortly after it was purportedly written, September 1. The memo file did not appear in the "S" drive until November 15, although Lopez searched for earlier dates. He did not locate the file on LaMont's or Sexton's computers. He testified it was copied onto Bannert's computer on November 15 and put on the shared drive that same day. He concluded it came to the "S" drive from Bannert's computer, but that originally it was created on a home computer, and moved to one at the office.

In searching for the file on Catlett's office computer, Lopez found another file in response to key word searches; a file identified as "TKO dot doc." When he tried to open the TKO file, only a blank page appeared. This file had been revised five times. In using a diagnostic program, he found on the seemingly blank document the identical words that were on the memo Catlett purportedly found on the "S" drive on November 12.

Gerald Alexander is a computer analyst and senior programmer analyst at the University of Texas at Brownsville. He examined the computers and the diskette that was identified by Catlett as the one on which he copied the 9-1 memo. He reached the identical conclusions as Lopez and appellants' expert, Mark Anastasi, that the memo was not on LaMont's computer at the hospital, but it was on Catlett's and Bannert's and the hospital's shared drive. Alexander testified there is no evidence it was on the shared drive before November 15, although Catlett testified he found it there on November 12. All agreed that the apparently blank page that was found on Catlett's office computer with the file name "TXO dot doc" has language hidden in it identical to the language on the questioned memo.

Both Alexander and Anastasi testified the memo went from Catlett's computer, then to Bannert's, then to the "S" drive. They agreed that the diskette produced by Catlett that he had purportedly used to copy the file from the "S" drive was not a true copy of that file because the file on the diskette contained additional bytes of information that was not on the file on the shared drive. If a file is copied from one medium to another by "dragging and dropping," it is an exact duplicate of the original. The memo on the "S" drive is an exact copy, a "clone", of the one on Bannert's computer, although not a "clone" of the one on Catlett's diskette.

Alexander testified he did not think the memo was originally written on Bannert's computer because it was not saved in her "my documents" folder, the normal default location in Microsoft Word for storing documents. He believed it came from someone's hard drive, and did not originate on the shared drive. He testified that the chronological order of the four copies of the memo on the hospital's computers to be: (1) first, the file "TKO dot doc" on Catlett's computer, created November 15, 1999, at 7:54 a.m.; (2) next, the one found on Bannert's hard drive, November 15, 10:46 a.m.;(3) then, Catlett's with the name "memo temp dot doc" on November 15, at 11:31 a.m.; and (4) the final one, on the shared drive on the hospital's system on that same day at 11:41 a.m. The memo went from Catlett's computer to Bannert's computer, then to the "S" drive. The memo does not appear on the backups for the "S" drive until November 15, although Catlett testified he copied it from that drive on November 12.

Alexander once testified that, in his opinion, LaMont wrote the memo at issue. Subsequently, he said, "There is nothing that leads me to believe that anybody wrote it." The reason for his conclusion that LaMont wrote it is essentially that he believed "someone was trying to pull a fast

one." He believed the hospital was "trying to pull a fast one" because of two considerations: (1) there was confusion supplying LaMont's and Sexton's computers for examination by him, Lopez, and Anastasi; and (2) the possibility of tampering with the back-up tapes to the "S" drive of the hospital's computer system to allow a deletion of the memo from that drive from September 1 until November 15.

Alexander testified that when the experts arrived to examine the computer used by LaMont, they were given a computer identified as hers. But after Alexander noticed that the computer had not been heavily utilized and did not have any document on it dated prior to September 7, 1999, he questioned Lopez about it. The explanation was that the hospital had given LaMont a new computer sometime in early September, and the one she had previously used was transferred elsewhere after it had been reformatted. Alexander testified that reformatting removes all information from the machine's hard drive.[2] The experts then went to examine Sexton's computer, Alexander said, but it too was a different one than he had on September 1, 1999.

Alexander concluded his direct examination with the statement, "To me, the logical conclusion to all this, particularly taking into account the date of the letter is September 1, the fact that we were given the wrong PC, et cetera, the most logical conclusion to me would be that it was Ms. LaMont that wrote the letter." This conclusion is not supported by Alexander's examination of the various computer hard drives and diskette. All of his analysis concludes the memorandum was placed on the shared drive from Bannert's computer

on November 15, was transferred to Bannert's computer from another source, and that the diskette supplied by Catlett did not contain an accurate copy of the memo on the shared drive. There is no evidence to support his conclusion that LaMont wrote the questioned memorandum.

■ "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983). Suspicion linked to other suspicion produces only more suspicion, not some evidence. *Pitzner*, at 727.

Appellant's sixth issue is sustained. Because of our resolution of appellants' first and sixth issues, it is not necessary to examine any others. The judgment is REVERSED AND RENDERED that appellee Bannert take nothing.

---

2. Mark Anastasi testified that after the initial mixup surrounding what computer LaMont used on September 1, that specific computer was finally produced and examined by him, Alexander, and Lopez. It had not been reformatted and had files on it dating at least back to July 1999. There was no trace of any file relevant to this lawsuit found on it.