

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-14-00283-CV

JERRY V. DURANT; JERRY
DURANT, INC. D/B/A DURANT
TOYOTA AND D/B/A JERRY
DURANT TOYOTA; JERRY
DURANT HYUNDAI, LLC; DOYLE
MAYNARD; ROBERT G. COTE,
SR.; GARY MICHAEL DEERE;
JERRY RASH; AND ELLIOT
"SCOOTER" MICHELSON

APPELLANTS

V.

ANDREW ANDERSON

APPELLEE

----------

FROM THE 153RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 153-257626-12

----------

## MEMORANDUM OPINION[1]

----------

Jerry V. Durant; Jerry Durant, Inc. d/b/a Durant Toyota and d/b/a Jerry

Durant Toyota; Jerry Durant Hyundai, LLC; Doyle Maynard; Robert G. Cote, Sr.;

---

[1]*See* Tex. R. App. P. 47.4.

Gary Michael Deere; Jerry Rash; and Elliot "Scooter" Michelson appeal from the trial court's judgment awarding appellee Andrew Anderson $2,527,151, plus pre- and postjudgment interest and costs, on his claims against them. We reverse and render a take-nothing judgment.

**Background Facts**

Anderson began working for Durant in 2001 as a used car manager in Weatherford, Texas at one of Durant's dealerships. He worked his way up through the company, and in 2006, Anderson was promoted to general manager.

In February 2011, Anderson claims that Durant offered him the opportunity to be the dealer owner/operator of two of the Durant dealerships in Granbury, Texas. According to Anderson, Durant offered him 10% "of the land and the dealerships they sit on." Durant claims that he offered Anderson, if he could meet certain requirements by the end of the year, a buy-in opportunity for the Hyundai dealership only. Durant told Anderson he would give him the same offer for the Toyota dealership if Toyota approved it. Durant denied offering Anderson any interest in the land. Both Anderson and Durant acknowledged that no written agreement was ever signed. Anderson moved over to the Granbury dealerships. He claimed his title became dealer partner/principal.

On December 8, 2011, Durant announced that he was negotiating a sale of the dealerships to a third party. Anderson secretly recorded the meeting during which Durant made the announcement. At a Christmas party on December 15, 2011, Durant gave Anderson a check for $75,000. Anderson

2

testified that it was a Christmas bonus. Durant claimed it was in lieu of the buy-in opportunity for 10% ownership interest. No document was signed regarding the purpose of the check.

On December 26, 2011, Durant held a meeting for all of the used car managers. During the meeting, Durant yelled at Anderson for buying used cars directly from a wholesale dealer named Jake DeKoker. Anderson claims that he had never been told not to buy from DeKoker.

Two days later, Anderson and Durant met again. Robert Cote, a consultant for Durant, was also present at the meeting. According to Anderson, Durant accused him of taking kickbacks on cars he purchased from DeKoker. Durant claims that he only discussed his concern that Anderson was mismanaging the used car inventory at the Granbury dealerships. Cote estimated that cars that Anderson had purchased from DeKoker lost about $30,000. Cote testified that in the meeting, Anderson admitted that he had purchased the cars from DeKoker when he should not have, agreed with Cote's estimation of lost profit on the cars, volunteered to pay that amount back to Durant, and agreed to take a polygraph exam.

Anderson took a polygraph exam on January 4, 2012, and the results came back as inconclusive. Anderson immediately requested a meeting with Durant, Cote, and Don Allen, co-owner of the Durant entities. He secretly recorded the meeting on his phone. During an argument over the $30,000, Durant told Anderson, "Well, if you think that's wrong, . . . you can hit the dirt."

3

Cote testified that he believed that Anderson was moving to the Weatherford Chevrolet store. Anderson thought Durant meant that he was fired. Anderson did not return to work at the Durant entities.

After Anderson left, he learned that rumors were circulating that he had been fired for taking kickbacks. On January 26, 2012, Anderson sued Durant, the Durant entities, and Cote for defamation, and he sued Durant and the Durant entities for breach of contract, quantum meruit, fraud, fraudulent inducement, promissory estoppel, and attorney's fees.[2] Durant and the Durant entities filed counterclaims against Anderson for breach of fiduciary duty and conversion. In August 2012, Anderson amended his petition to include Doyle Maynard, Elliot Michelson, Jerry Rash, and Gary Michael Deere in his defamation cause of action.[3] Maynard and Rash were Durant employees. Michelson ran off-site auctions for Durant, and Deere was a wholesale car dealer who bought cars from the Durant entities. Anderson also included Silverado Life Reinsurance

---

[2]Durant also sued William R. Shapiro, owner of another Chevrolet dealership, for defamation for republishing the statements.

[3]Anderson also included Don Allen, Amanda Hedrick, Carol Walsh, Justin McLaughlin, Brandi Shapiro, and Chuck Terrill as defendants in his August 2012 amended petition. In December 2012, Anderson also added Jerrel Bolton. Bolton filed a motion for summary judgment on Anderson's claim against him, which the trial court granted. Anderson nonsuited his claims against William Shapiro, Brandi Shapiro, and Terrill. Anderson and Hedrick entered an agreed partial order of dismissal of Anderson's claims against her. The jury found that Walsh and McLaughlin were 0% liable to Anderson for any damages. The jury also found for Allen on Anderson's claims against him. Allen, McLaughlin, Walsh, Hedrick, Bolton, Terrill, and the Shapiros are not parties to this appeal.

4

Company, the entity that owns the real estate where the Durant Hyundai dealership is located, in his breach of contract, quantum meruit, fraud, fraudulent inducement, promissory estoppel, and attorney's fees claims. Anderson added a claim of conspiracy against Durant and Allen.

After a seven-week jury trial, the jury found the following in relevant part:

1. Durant did not agree "to immediately provide" Anderson 10% ownership in the Durant entities and the associated real estate.

2. Durant and the Durant entities, but not Silverado, committed fraud against Anderson.[4]

3. Durant and Allen did not conspire to defraud Anderson.

4. The value of a 10% ownership interest in the Durant Toyota dealership was $323,150. The value of a 10% ownership interest in the Durant Hyundai dealership was $60,000.

5. Durant, Cote, Rash, Maynard, Michelson, and Deere published a defamatory statement about Anderson.

6. Maynard was not acting in the scope of his employment when he defamed Anderson, and he was not privileged to make the statement.

7. Rash, Michelson, and Deere were not privileged to make the statement.

8. Anderson sustained damages in the amounts of:

   a. Past injury to reputation: $400,000

   b. Future injury to reputation: $400,000

   c. Past mental anguish: $400,000

   d. Future mental anguish: $400,000

---

[4]Silverado is not a party to this appeal.

5

e. Past lost income: $269,000

f. Future lost income: $360,000

9. Durant was 85% liable for Anderson's damages. Maynard, Cote, and Michelson were each 1% liable. Deere and Rash were each 5% liable.

10. Cote, Rash, Maynard, Michelson, and Deere acted with malice, fraud, or gross negligence.

11. Anderson was not liable to Durant and the Durant entities on their claims against him.

Based on the jury's findings, the trial court awarded Anderson $323,150 from Durant and Durant Toyota for fraud, $60,000 from Durant and Durant Hyundai for fraud, $2,144,001 from Durant for defamation, plus interest and costs. The trial court ordered that Anderson could elect to recover from Cote, Maynard, Michelson, Rash, and Deere for the defamation damages in proportion to their liability. Durant, the Durant entities, Cote, Deere, Michelson, Rash, and Maynard appealed.

## Discussion

### I. The Durant and Durant entities' appeal

#### A. Fraud

In their first two issues, Durant and the Durant entities challenge the jury's findings on Anderson's fraud cause of action. The jury found that Durant, Durant Toyota, and Durant Hyundai made a fraudulent misrepresentation to Anderson. The jury answered the question regarding fraud damages as follows:

6

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Andrew Anderson for his damages, if any, that resulted from such fraud, if any?

. . . .

1. The value of a 10% ownership interest in the Durant Toyota dealership in Granbury, Texas, excluding the value of the associated real estate.

Answer: $323,150

2. The value of a 10% ownership interest in the real estate associated with the Durant Toyota dealership in Granbury, Texas.

Answer: - 0 -

3. The value of a 10% ownership interest in the Durant Hyundai dealership in Granbury, Texas, excluding the value of the associated real estate.

Answer: $60,000

4. The value of a 10% ownership interest in the real estate associated with the Durant Hyundai dealership in Granbury, Texas.

Answer: - 0 -

In Durant and the Durant entities' second issue, they argue that benefit-of-the-bargain damages are not recoverable for fraud absent an enforceable contract. *See Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015). Question No. 1 of the jury charge asked,

In February, 2011, did Jerry Durant, acting on behalf of himself, and Durant Toyota, Durant Hyundai, and Silverado, agree to immediately provide Andrew Anderson a 10% ownership interest in both the Durant Toyota and the Durant Hyundai dealerships in Granbury, Texas, and agree to immediately provide Andrew Anderson a 10% ownership interest in the real estate associated with both the Durant Toyota and Durant Hyundai dealerships in Granbury, Texas, in

7

exchange for Andrew Anderson becoming the General Manager for the Durant Toyota and Durant Hyundai dealerships in Granbury, Texas?

The jury answered "no" to Question No. 1; therefore, Durant argues, there was no contract on which to base benefit-of-the-bargain damages.

Anderson argues that the contract underlying his fraud claim is not the same contract that the jury failed to find in Question No. 1. The fraudulent contract, he claims, is the same agreement addressed in Question No. 1 "**less** the real estate." He bases this argument on the jury's award of $0 for the value of the real estate of the two dealerships in the fraud damages question.

We cannot infer, as Anderson asks us to do, from the jury's award of zero damages for the real estate that it found an agreement described nowhere in the jury charge; all we can discern is that the jury found that Anderson was not entitled to compensation for any injury he may have suffered relating to the real estate. *See Macias v. Ramos*, 917 S.W.2d 371, 376 (Tex. App.—San Antonio 1996, no writ) (stating that jury's answer of "-0-" for damages question did not imply that the plaintiff did not suffer injuries, only that the plaintiff was not entitled to compensation for those injuries); *Frank B. Hall & Co. v. Buck*, 678 S.W.2d 612, 625 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) (holding that jury's answer of "no" to question asking whether a note was substantially true was "a failure to find the note true, not a finding that it was not true"), *cert. denied*, 472 U.S. 1009 (1985). Anderson bore the burden of securing jury findings on all elements of his claim. *See* Tex. R. Civ. P. 279; *Discover Prop. & Cas. Ins. Co. v.*

8

*Tate*, 298 S.W.3d 249, 257 (Tex. App.—San Antonio 2009, pet. denied) ("[A] party with the burden of proof on a ground of recovery or defense has the duty to submit all disputed elements of his cause of action to the jury."). He failed to secure a finding that there was an enforceable contract between him, Durant, and the Durant entities. His fraud claim fails because there was no sustainable measure of fraud damages submitted to or found by the jury. *See Zorrilla*, 469 S.W.3d at 154 ("[B]enefit-of-the-bargain damages are not available if [the plaintiff] would not have been able to enforce the bargain in question . . . , and the fraud claim would fail for want of an appropriate damages finding."). We sustain Durant and the Durant entities' second issue. Because we sustain their second issue, we do not need to reach their first issue. *See Elijah Ragira/VIP Lodging Grp., Inc. v. VIP Lodging Grp., Inc.*, 301 S.W.3d 747, 761 (Tex. App.—El Paso 2009, pet. denied) (rendering a take-nothing judgment when sufficient evidence did not support jury's award of damages for fraud claim).

### B. Defamation

Durant and the Durant entities' third through fifth issues challenge the jury's findings on Anderson's defamation claim. In their fifth issue, they challenge the evidence supporting the jury's damages findings. After finding Durant and the Durant entities liable to Anderson for defamation, the jury awarded Anderson $400,000 for past injury to reputation, $400,000 for future injury to reputation, $400,000 for past mental anguish, $400,000 for future mental anguish, $269,000 for past lost income, and $360,000 for future lost income.

9

**1. Standard of review**

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)

10

(op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

Defamation per se is presumed to cause reputation harm for which a plaintiff is entitled to general damages. *Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014) (citing *Bentley v. Bunton*, 94 S.W.3d 561, 604 (Tex. 2002)). Yet this presumption supports only nominal damages; anything beyond nominal damages must be supported by evidence. *Id.* Noneconomic damages such as mental anguish and injury to reputation "cannot be determined by mathematical precision; by their nature, they can be determined only by the exercise of sound judgment." *Bentley*, 94 S.W.3d at 605. However, noneconomic damages should only compensate the plaintiff for actual injuries and not be "a disguised disapproval of the defendant." *Id.*

### 2. Analysis

#### a. Damage to reputation

Anderson testified that his proof of damage to his reputation was that he "[d]idn't get a job for nine and a half months. Have not secured a like job like I had." Although he testified that "a few people" had told him that he "need[ed] to straighten this mess out," he could not provide names of people who had expressed concerns about his reputation. Anderson testified that he had started looking for a new job "within days" and that "[p]hone calls were coming in and [he] was talking to people." Anderson went on "[a]t least five or six" interviews right after he left the Durant entities. He testified that he was offered some of the

11

interviews because the employers had heard that he had left Durant. Anderson found a permanent position at Frank Kent Honda in October 2012. William Churchill, the president of the Frank Kent dealership, testified that he was aware of the lawsuit when he hired Anderson and that Anderson had come "highly recommended." When asked if he had any indication that he had not secured employment because of damage to his reputation, Anderson said that he did not have any proof "either way." When asked to put a dollar figure on the damage to his reputation, he said, "I'm leaving it up to the jury to decide."

Jason Hiley, president of Hiley Automotive Group, testified that he reached out to Anderson a few days after Anderson had left the Durant entities to discuss "a potential executive management job" with his company. Hiley also testified that Anderson had come "highly recommended" and he had received very good references. Hiley said that he did not hire Anderson because he was "already pretty far down the road" with another candidate. Hiley said that he would consider hiring Anderson for a hypothetical future position if he "knew what the outcome of the rumors [that Anderson took illegal kickbacks] were." He stated that he still had a good personal opinion of Anderson.

Carey Williams, the executive manager of the James Wood General Motors dealership, testified that Anderson's reputation "is always really good." James Minor, the general manager of a small dealership, testified that his opinion of Anderson was that he was a "very upstanding man." Maynard testified that he

12

had "never thought" Anderson's reputation was good. Deere and Risinger likewise testified that Anderson had had a bad reputation.

Anderson bore the burden of demonstrating that the defendants were responsible for the rumors that Anderson had been fired for taking illegal kickbacks, but the record is devoid of evidence regarding the rumors' source. *See Columbia Valley Reg'l Med. Ctr. v. Bannert*, 112 S.W.3d 193, 201 (Tex. App.—Corpus Christi 2003, no pet.) (holding that there was no evidence of defamation when there was no evidence that defendant was the source of defamatory rumors). Anderson had told multiple people about the accusations made and the circumstances surrounding his departure from the Durant entities. The only evidence that Anderson had been fired came from Anderson himself. Durant, Allen, and the Durant entities' accountant testified that Anderson had never been fired, but had voluntarily resigned. Employment records from the Durant entities also reflect that Anderson resigned.

Although there was evidence of differing opinions of Anderson, there was no evidence that anyone believed the rumors that Anderson took kickbacks or that anyone's perception of Anderson had changed because of the rumors. To put it another way, there was insufficient evidence that any damage to Anderson's reputation had been caused by the rumors or would be caused in the future. Anderson offered no evidence that his time spent unemployed was due to any defamatory statements that were circulating in the car industry, that is, that he was unable to secure employment because of the damage to his reputation

13

caused by any of the defendants. *See Exxon Mobil Corp. v. Hines*, 252 S.W.3d 496, 504 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (holding that plaintiff's evidence of damages caused by termination of his employment was not any evidence of damages resulting from defamation). By his own testimony, employers had sought him out to discuss job opportunities. He did not identify any position that he was not offered because of his allegedly tarnished reputation. The two witnesses who had inquired about his reputation both testified that he had been "highly recommended" to them. The president of the Frank Kent dealership hired Anderson with full knowledge of the lawsuit. Hiley testified that he was "pretty excited about talking to [Anderson] because he had a really good reputation." Even after hearing more details concerning the rumors about Anderson, Hiley maintained at trial that Anderson was a "really good guy [with a] really good reputation." *Cf. Morrill v. Cisek*, 226 S.W.3d 545, 550 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (holding evidence legally sufficient to support damage award for reputation injury when plaintiff testified that his employer told him that defamatory letters were "threatening his career," that his alleged conduct was "inconsistent with a continued employee/employer relationship," and that he had not been promoted or received a salary increase since the defamatory letters).

Further, there is no evidence that $400,000 is a fair and reasonable amount that would compensate Anderson for any past damage to his reputation. *See Waste Mgmt of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d

14

142, 160 (Tex. 2014) ("[T]he evidence must be legally sufficient as to both the existence and the *amount* of such damages . . . ."). Any award beyond a nominal amount must be supported by evidence. *Burbage*, 447 S.W.3d at 259. The jury awarded Anderson the same amount for his future damage to reputation, which he testified would not be a problem after the trial. "Juries cannot simply pick a number and put it in the blank. They must find an amount that, in the standard language of the jury charge, 'would fairly and reasonably compensate' for the loss." *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996). Here, the fact that the jury awarded the same amount for past reputation damage and future reputation damage, as well as past and future mental anguish, is not evidence that the jury evaluated Anderson's alleged injuries; it tends to support Durant and the Durant entities' claim that the amounts instead represent "disguised disapproval of the defendant[s]." *Bentley*, 94 S.W.3d at 605. There is therefore no more than a scintilla of evidence supporting the jury's award of reputational damages.

### b. Mental anguish

Anderson testified that the accusations "basically destroyed" him. He said, "[S]ince these accusations have come about, I'm paranoid about going outside. Have trouble focusing. Anxiety, anxious. It's been a two-year nightmare trying to get my life back and my reputation back." He also testified, "I had trouble sleeping. I had trouble eating. I had trouble focusing on things. I worried about

15

my family's future.  Worried about my 30-year career that had been slandered all over town."

Anderson claimed that the defamation has affected his relationship with his wife, but when asked in what way, he said, "It's affected our relationship and how we communicate, how we talk to each other on a day-to-day basis.  This is overwhelming to be involved in a lawsuit and the allegations—having to bring this lawsuit."

Describing how it has affected his relationship with his daughter, he testified,

> This whole two-year process has consumed my free time. Worrying about where I'm going to get a job, keeping a job.  You know, going out in public where we used to go out in public, we can't go out in public anymore.  It's not the same.  It's a small community, and when you go out in public, you're always wondering what somebody is saying about you.  What have they heard?  What do they know?  So it's been tough.

Anderson testified that he has seen a psychiatrist five times since he left the Durant entities.  He was prescribed an anti-anxiety medication.  Anderson did not seek professional help for five months after he left the Durant entities until he was referred to the psychiatrist by his lawyers.  He testified that he waited because he was "trying to tough it out."  Anderson also testified that he believed his name would be cleared by the jury's verdict.

In order to sustain a jury award of mental-anguish damages, there must be not only evidence of compensable mental anguish but also some evidence justifying the amount awarded.  *Bentley*, 94 S.W.3d at 606 (citing *Saenz,*

16

925 S.W.2d at 614). Such evidence must show more than mere worry, anxiety, vexation, embarrassment, or anger; it must directly demonstrate the nature, duration, and severity of the mental anguish, which caused a substantial disruption in the claimant's daily routine. *Hines*, 252 S.W.3d at 505. Here, Anderson presented evidence that he was embarrassed, depressed, and anxious. However, he did not present evidence that these emotions rose to a compensable level.[5] *See Saenz*, 925 S.W.2d at 614 (holding that statement that plaintiff worried about losing her house and paying medical bills was not evidence of compensable mental anguish or that amount awarded was fair and reasonable compensation); *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 445 (Tex. 1995) (holding that plaintiffs' statements that they were angry, frustrated, and vexed showed the existence of "mere emotions" but not of a compensable level).

---

[5]Anderson cites a number of cases in which he claims that "courts have upheld comparable awards based on similar evidence." However, in each of those cases there was significantly more evidence of more severe injuries than was presented in this case. *See Adams v. YMCA of San Antonio*, 265 S.W.3d 915, 916 (Tex. 2008) (involving a nine-year-old child who was sexually abused by his counselor while at summer camp and including expert testimony on the long-term effects of such abuse); *O'Dell v. Wright*, 320 S.W.3d 505, 514 (Tex. App.—Fort Worth 2010, pet. denied) (involving a victim of sexual assault who described physical symptoms of anxiety, included clinching her jaw, holding her breath, feeling paralyzed, shaking, being nauseated, having a racing heartbeat, rising blood pressure, and feeling "dirty, angry, disgusted, and powerless" (internal quotations omitted)), *abrogated on other grounds by Zorrilla*, 469 S.W.3d at 155; *Rentech Steel, L.L.C. v. Teel*, 299 S.W.3d 155, 165–66 (Tex. App.—Eastland 2009, pet. dism'd) (including expert testimony that plaintiff's injury was the worst the expert had ever seen, plaintiff's testimony that he "could hear and feel crunching and popping" of his bones as they broke, and testimony from the plaintiff, his parents, surgeon, and counselor describing his "very clear" depression, subsequent addiction to pain killers, and suicidal thoughts).

Anderson testified that he was overwhelmed by the lawsuit and that he lost free time because of his job hunt, but he did not describe a substantial disruption in his daily routine beyond the general stress of a lawsuit. Anderson also did not provide other witnesses who could testify to Anderson's alleged deterioration. *See Hancock v. Variyam*, 400 S.W.3d 59, 70 (Tex. 2013) (noting, in holding evidence insufficient to support mental-anguish award, that no witnesses corroborated "an outward manifestation of the mental anguish Variyam allegedly experienced").

Anderson was further required, to recover for future mental anguish, to prove not only that in reasonable probability that he would suffer mental anguish in the future but also a probable reasonable amount of the future damages. *See MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 654–55 (Tex. 1999); *Cairus v. Gomez*, No. 03-06-00225-CV, 2006 WL 3523797, at *13 (Tex. App.—Austin Dec. 6, 2006, pet. denied) (mem. op.) (applying *MCI* to future mental anguish and holding that husband's testimony that plaintiff was "real[ly] frightened" of the future was no evidence of future mental anguish or of present mental anguish that could support an inference of future mental anguish). Anderson provided no testimony regarding whether he thought his alleged mental anguish would likely improve, and how much and when, nor did he provide any evidence that it would continue or grow worse over time. As stated above, that the jury awarded an equal $400,000 amount for Anderson's future mental anguish, of which there is no evidence, as it did for Anderson's supposed

18

past mental anguish evidences that the amounts awarded were not fair assessments of Anderson's injuries. *See Bentley*, 94 S.W.3d at 605 ("The jury's award of $7 million in mental anguish damages strongly suggests its disapprobation of Bunton's conduct more than a fair assessment of Bentley's injury."). There is therefore no more than a scintilla of evidence supporting the jury's award of mental anguish damages.

### c. Lost income

As to past lost income, Anderson testified that he started looking for a new job "within days" and that "[p]hone calls were coming in and [he] was talking to people." Anderson went on "[a]t least five or six" interviews right after he was fired. He testified that he was offered some of the interviews because the employers had heard that he had left the Durant entities. Anderson got a job at Holt Fiat doing "contract labor" buying used cars. He earned roughly $4,000 buying cars for Holt Fiat.

Anderson got a job at Frank Kent Honda as the used car director in October 2012, about nine months after he left the Durant entities. He made $120,000 a year at Frank Kent plus bonuses. He had made about $300,000 a year at the Durant entities.

Anderson was promoted to new sales director overseeing two dealerships, but he said he did not receive a pay increase. Frank Kent terminated Anderson on November 1, 2013. Churchill testified that Anderson was fired for performance reasons.

19

Anderson claims that "word of his alleged criminal acts had spread to other dealers preventing him from obtaining other employment," but he provided no evidence that he was not hired because of the rumors about him. In fact, he testified himself that dealerships had called him when they heard he had left the Durant entities. Churchill and Hiley testified that Anderson "came highly recommended."

Regarding future lost income, Anderson testified

I took the 200,000 that I had been making, and the best job I've got so far is 120,000. So I took the 200,000 less 120,000, which leaves 80,000 in arrears.

. . . .

So you take the 200,000 less the 120, it leaves you 80,000 per year that I should—feel like I should be making. Lord willing, I have nine more years left in me, if everything works like it's supposed to. Hopefully a lot more than that. So I took the nine years times eight, 80,000, and that's 720,000 I'm seeking.

As Anderson himself notes in his brief on appeal, "an employee cannot recover as defamation damages those damages *caused by employment termination*." *Hines*, 252 S.W.3d at 503. Instead, he argues that his lost income was caused and would be caused in the future "*by Durant's defamation*." Yet he does not point to any evidence, nor have we found any, demonstrating that Anderson's decrease in salary was the result of the defamation itself and not merely the result of leaving his employment at the Durant entities and taking different employment.

20

Likewise, although Anderson provided testimony, including that of an expert witness, with calculations of future lost income, none of that testimony suggested that Anderson would suffer damages in the future caused by the defamation. Anderson's expert did not opine on the reason for Anderson's reduced income. Anderson provided the expert with salary figures and requested that the expert use certain assumptions regarding how long it would take him to regain his earning capacity. The expert testified, "I don't sit here giving opinions about how long it would take him to recover to his prior earning capacity. I'm simply doing the financial calculation to reduce his figures and his assumptions to present value."

The plaintiff is always required to prove the existence of special damages such as lost income in order to recover them, even when he alleges defamation per se. *See Hancock*, 400 S.W.3d at 65. Part and parcel of proof of damages is the "causal link" requirement: evidence of "a direct causal connection between the damages awarded, the defendant's actions, and the injury suffered." *Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 838 (Tex. 1997) (citing *Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 181 (Tex. 1995), *abrogated on other grounds by Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007)). Here, Anderson failed to link the acts of the defendants to any loss of his income. Such failure precludes his recovery. We sustain Durant and the Durant entities' fifth issue.

21

### 3. Punitive damages

Durant and the Durant entities' fourth issue concerns the jury's award of punitive damages. "Without evidence of actual damages, punitive damages cannot be recovered." *Saenz*, 925 S.W.2d at 614. Because we hold that no evidence supports the jury's awards of actual damages, we sustain Durant and the Durant entities' fourth issue. Having sustained Durant and the Durant entities' fourth and fifth issues, we do not reach their third issue. *See* Tex. R. App. P. 47.1.

## II. The Cote, Deere, Michelson, and Rash appeal

Cote, Deere, Michelson, and Rash's first three issues concern the jury's defamation findings. Their second issue challenges the malice finding, and their third issue challenges the award of defamation damages. For the same reasons we articulated in sustaining Durant and the Durant entities' issues regarding the defamation damage award and the punitive damage award, we sustain Cote, Deere, Michelson, and Rash's second and third issues. We therefore do not reach their first issue. *See id.* Their fourth issue challenges the trial court's judgment holding them jointly and severally liable for court costs. Because we reverse the award of damages, we reverse the award of costs. *See* Tex. R. Civ. P. 131. We therefore sustain their fourth issue.

## III. The Maynard appeal

Maynard's first four issues concern the jury's defamation findings. His fourth issue challenges the award of defamation damages. For the same

22

reasons we articulated in sustaining Durant and the Durant entities' issue regarding the defamation damage award, we sustain Maynard's fourth issue. We therefore do not reach his first three issues. *See* Tex. R. App. P. 47.1. Maynard's fifth issue challenges the trial court's judgment holding him jointly and severally liable for court costs. Because we reverse the award of damages, we reverse the award of costs. *See* Tex. R. Civ. P. 131. We therefore sustain Maynard's fifth issue.

## Conclusion

Having sustained the appellants' dispositive issues, we reverse the trial court's judgment and render judgment that Anderson take nothing on his claims.

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL: GARDNER, WALKER, and GABRIEL, JJ.

DELIVERED: February 11, 2016